***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of Deputy Commissioner Houser and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matter of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the parties on March 1, 2002.
3. Defendant-employer is self-insured and the servicing agent at the time of plaintiff's alleged occupational disease was Key Risk Management Services.
4. Plaintiff alleges that she suffers from a work-related occupational disease of anxiety, depression and stress that was caused by the work environment at Dixon Middle School in Onslow County.
5. Defendant denies the compensability of this claim.
6. Plaintiff's average weekly wage was to be determined by an appropriately completed Industrial Commission Form 22 Wage Chart. However, defendant did not submit a Form 22.
7. The parties submitted a packet of Industrial Commission forms, which was admitted into the record and marked as Stipulated Exhibit (2) and a packet of medical records, which was admitted into the record and marked as Stipulated Exhibit (3).
8. The issue before the Commission is whether plaintiff's emotional and psychological problems are compensable as an occupational disease, and, if so, to what benefits she is entitled.
 ***********
Based upon the competent evidence of record herein, the Full Commission rejects the findings of fact made by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 56 years old and was born on June 2, 1947. Plaintiff worked as a school teacher for defendant-employer from 1987 until February 2002. Plaintiff was an elementary school teacher until approximately 1996, when she became a sixth grade teacher at Dixon Middle School.
2. While working at Dixon Middle School, plaintiff had problems maintaining order in her classroom on a continuous basis. During 2001, plaintiff experienced some type of disciplinary incident every week. Plaintiff dreaded going to work because of these disciplinary problems. Because of plaintiff's lack of classroom management, her students were disrespectful and verbally and physically harassed and intimidated her. Examples of the type of verbal harassment plaintiff was subjected to included being called a "grease monkey," students using curse words towards her, and being teased because of her name. Students regularly walked out of plaintiff's classroom without permission and wrote rude remarks about plaintiff in their books. Additionally, plaintiff had spitballs and wads of paper thrown at her by students. On one occasion during an assembly, plaintiff was hit in the back of her head by an object thrown by a student. As a result of that incident, plaintiff began sitting at the top bleachers of the gym with her back to the wall during assemblies. Plaintiff referred an unusually large number of students to the principal's office and received comments from the administration regarding the volume of her referrals. Students and parents complained to the school administration about plaintiff's performance as a teacher.
3. During her employment, plaintiff received negative performance reviews, resulting in four Action Plans intended to improve plaintiff's job performance. An Action Plan is required by law if, at any point during or at the end of the school year, a teacher ranks below standard in any of the major functions. On January 25, 2002, plaintiff entered into her fourth Action Plan with defendant-employer. The Action Plan required plaintiff in February, March and April 2002 to show progress toward overcoming her deficiencies and present information to show that she was attempting to comply with the Action Plan. The Action Plan had an anticipated completion date of May 28, 2002. The Action Plan addressed plaintiff's problems with her failure to follow a classroom management plan, random efforts in discipline, negative learning climate in her classroom, errors in grading practices, ineffective instructional presentation, lack of feedback to students, and numerous student and parent complaints. Pursuant to the January 25, 2002 Action Plan, plaintiff's progress was scheduled for review at the end of February 2002, at which time plaintiff was to provide the school with evidence of her efforts to comply with the Action Plan.
4. At a February 25, 2002 observation of her classroom by a curriculum specialist, plaintiff failed to show progress or improvement in the quality of her classroom instruction. The curriculum specialist noted that plaintiff was experiencing the same classroom problems listed in the January 25, 2002 Action Plan.
5. Plaintiff's first deadline for submission of information to show that she was complying with the current Action Plan was February 28, 2002. Plaintiff did not submit any information to the school. Plaintiff was given a reminder that she was scheduled to meet with Lesley Eason, Dixon Middle School principal, at 3:15 p.m. on February 28, 2002. Rather than attend this meeting, plaintiff asked Ms. Eason for a four-day extension of the deadline.
6. On March 1, 2002, Ms. Eason met with plaintiff and advised her that she had not documented sufficient progress and that the curriculum specialist would observe her classroom again on March 4, 2002, before discussing her observations with plaintiff. Ms. Eason told plaintiff to continue to work to demonstrate improved classroom instruction and that she would share the results of their meeting with the personnel department. Plaintiff refused to sign a warning letter, left school and never returned to school. On April 19, 2002, plaintiff officially resigned her position with defendant-employer, effective June 3, 2002.
7. Ms. Eason testified that on February 27, 2002, she wrote a letter to the assistant superintendent in charge of personnel services recommending the school board not renew plaintiff's teaching contract due to plaintiff's lack of performance for the school year 2002 — 2003.
8. Plaintiff testified at the hearing before the Deputy Commissioner that she was unable to continue working at the school because of the feeling that she could no longer handle the work environment due to her stress and anxiety. Plaintiff acknowledged that her stress was caused by her inability to perform her job in accordance with the requirements set by defendant, as well as her inability to achieve the requirements of the Action Plan and observational analysis. Plaintiff admitted that she did not have control of her classes, that her lesson plans and the subjects to be taught were not completed, that she had complaints from parents and students that grades were inaccurate, that she had not properly averaged students' grades, and that she had not completed the items listed on the January 25, 2002 Action Plan before she quit working for the school.
9. Ms. Eason testified that plaintiff's classroom was chaotic, volatile and dangerous for both plaintiff and her students. Ms. Eason explained that,
 when instruction is not being delivered and when the teacher does not have a good command of the curriculum or a high level of expertise in what he or she may be teaching, middle school children not on task is the last thing that we like to see happen because, one, they're not learning anything and, two, it is just a breeding ground for problems.
Ms. Eason testified that on nearly a daily basis, one of the other school personnel had to go to plaintiff's classroom to assist her because of student misbehavior. Ms. Eason explained plaintiff's situation: "I am very firmly of the opinion that [plaintiff] found herself in a situation where she was trying desperately to manage behavior, that she got terribly behind on grading any student assignments that may have been given, and therefore the kids were not getting any feedback." She further described plaintiff's breakdown of instructional delivery and classroom management as follows:
 [S]he had tremendous difficulty with her curriculum. There was no level of expertise that I was able to observe. In terms of instructional presentation and instructional delivery, there was so little teaching that took place in that classroom that it led to many, many of the problems that [plaintiff] has shared [in the hearing testimony] and that have shown up over and over again in many of these evaluations.
Ms. Eason felt that plaintiff herself created the chaotic classroom environment and that plaintiff's lack of instructional presentation and delivery in her classroom led to many of her classroom problems. Other teachers with the same students as plaintiff did not have similar problems. Ms. Eason stated that "in sixteen years I had never seen a situation as bad as the situation in [plaintiff's] classroom."
10. On March 6, 2002, plaintiff was examined by Dennis Chestnut, a psychologist. Dr. Chestnut found plaintiff was experiencing a severe emotional crisis and he considered hospitalizing plaintiff. At his initial interview with plaintiff, the two major areas of concern identified were family relations and occupational issues. Dr. Chestnut diagnosed plaintiff with Generalized Anxiety Disorder. As of March 6, 2002, Dr. Chestnut medically excused plaintiff from work and stated that she was unable to return to the teaching profession. Dr. Chestnut continued to treat plaintiff on an ongoing basis.
11. Dr. Chestnut explained that plaintiff's anxiety focused on her difficulty with the principal.
 [Plaintiff] had gotten a new administrator, and she felt that the new administrator was not supportive of her . . . the new administrator did not feel that [plaintiff] was doing a good job, and that regardless of how hard she worked or regardless of what she did, that the administrator was going to find something wrong with it. . . . [S]he felt that the administrator was not supportive when she made decisions in reference to students.
Dr. Chestnut testified that the overall job quality of plaintiff's work experience exacerbated and/or caused her generalized anxiety. Yet, Dr. Chestnut also testified that in mental health, experts do not necessarily speak of correlation or causation. Dr. Chestnut stated that AXIS evaluations were designed to be able to make a deferential diagnosis rather than to get into causality or correlation. Dr. Chestnut did state that plaintiff's employment with defendant exposed her to an increased risk of developing an anxiety disorder as compared to members of the general public not so employed. Dr. Chestnut stated that plaintiff's "job was driving her crazy" and that plaintiff's total job experience was a major stressor in her life. Dr. Chestnut did not indicate, however, that another person in the same work environment or experience would develop Generalized Anxiety Disorder. Dr. Chestnut conceded that Generalized Anxiety Disorder is the most prevalent psychiatric disorder reported in the United States.
12. The Commission gives little weight to the opinions of Dr. Chestnut concerning causation and increased risk of plaintiff's mental condition. Dr. Chestnut stated that the focus of his treatment was to be supportive of plaintiff, that he could not speak to the validity of plaintiff's complaints about the school work, and that he only dealt with plaintiff's perceptions. There is no testimony in Dr. Chestnut's deposition that he reviewed any of plaintiff's employment records or that he considered any concurrent personal stressors in plaintiff's life in formulating his opinions.
13. Although plaintiff developed an anxiety disorder, her psychological condition was not the result of anything caused by defendant or because she was required to do anything unusual as a teacher. Plaintiff was in a stressful classroom environment that was caused by her inadequate job performance and inability to perform her job duties as a teaching professional. Considering all the evidence presented, the Commission finds that there was nothing unusual about plaintiff's job with defendant or what was expected of her as compared to any person similarly situated. The work plaintiff was asked to perform by defendant was the same kind of work any teacher is required to do. Plaintiff was merely asked to perform her job in the manner it should have been performed. Plaintiff was responsible for the bad environment in her classroom.
14. The stress caused by plaintiff's conflicts with students and parents and her concerns about being disciplined and losing her job were not shown to have been characteristic of the teaching profession as opposed to occupations in general. Plaintiff's employment as a teacher did not place her at an increased risk of developing anxiety disorder as compared to the general public not so employed. Therefore, plaintiff has not proven by the greater weight of the evidence that her anxiety disorder is a compensable occupational disease under the provisions of the Workers' Compensation Act.
15. Although the parties' Pre-Trial Agreement indicates that plaintiff's average weekly wage was to be determined by an Industrial Commission Form 22 Wage Chart, no Form 22 was submitted. On plaintiff's Industrial Commission Form 18, her average weekly wage is shown as $789.15. Because no evidence of record contradicts that amount, plaintiff's average weekly wage was $789.15, yielding a compensation rate of $526.36.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P.Stevens Co., 79 N.C. App. 324, 331, 339 S.E. 2d 490,494 (1986). Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) the disease must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) the disease cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458,468; 256 S.E. 2d 189, 196 (1979).
2. Mental illness which results from failing to perform one's job duties, lack of a support system at the employment, the perception of being undervalued, the demanding nature of the employment, and/or working for an abusive supervisor is not compensable because it is not characteristic of and peculiar to any industry or profession and can occur outside of the employment. Woodyv. Thomasville Upholstery Inc., 355 N.C. 483, 562 S.E.2d 422
(2002); Lewis v. Duke University, 163 N.C. App. 408,594 S.E.2d 100 (2004); Clark v. City of Asheville,161 N.C. App. 717, 589 S.E.2d 384 (2003).
3. In the present case, plaintiff's stress and anxiety disorder developed from her inability to perform her job in accordance with defendant's requirements. UnderWoody and Lewis, plaintiff did not prove that her mental illness is due to causes and conditions which are characteristic of and peculiar to her employment. Woodyv. Thomasville Upholstery Inc., supra; Lewis v. DukeUniversity, supra.
4. Plaintiff did not contract a compensable occupational disease and is, therefore, not entitled to compensation under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for compensation under the North Carolina Workers' Compensation Act must be, and the same is hereby, DENIED.
2. Each side shall pay its own costs.
This 30th day of August 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING
 S/_______________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER