DOROTHY S. LEWIS, Employee, Plaintiff v. DUKE UNIVERSITY, Employer, SELF-INSURED, Defendant

No. COA03-480

(Filed 6 April 2004)

**Workers' Compensation— nursing—depression—occupational disease—insufficient evidence**

> The denial of workers' compensation to a nurse was affirmed where plaintiff contended that her depression was an occupational disease arising from her employment, but did not present sufficient evidence that the workplace stresses contributing to her condition were characteristic of and peculiar to her position as a registered nurse.

Appeal by plaintiff from opinion and award of the North Carolina Industrial Commission entered 15 November 2002. Heard in the Court of Appeals 24 February 2004.

*J. Randolph Ward for plaintiff appellant.*

*Cranfill, Sumner & Hartzog, L.L.P., by Jaye E. Bingham, for defendant appellee.*

WYNN, Judge.

In her appeal from an opinion and award of the Industrial Commission denying her claim for benefits, Dorothy Lewis, Plaintiff,

**LEWIS v. DUKE UNIV.**

[163 N.C. App. 408 (2004)]

contends the Commission erred in finding and concluding that she failed to prove she sustained an occupational disease in her position as a registered nurse at the medical center of Defendant Duke University. For the reasons hereafter stated, we affirm the opinion and award of the Commission.

The pertinent history of the instant appeal is as follows: On 24 April 2000, Plaintiff filed a claim for workers' compensation benefits, alleging she was permanently and totally disabled due to "major depressive disorder, recurrent, severe with melancholic features, and dysthymic disorder." On 25 February 2002, Plaintiff's claim for benefits came before the Commission. Dr. Nancy L. Roman, Plaintiff's treating psychiatrist, and Milton Lewis, Plaintiff's husband, testified on behalf of Plaintiff. Plaintiff was unable to testify. The evidence before the Commission tended to show the following:

Plaintiff began her employment as a registered nurse with Defendant in 1973 and worked continuously in that capacity until 15 August 1998, her last date of work. During the time period of 1989 until 1992, Plaintiff worked primarily with terminally ill patients, which she found "extremely disturbing." According to Dr. Roman, "some of these patients might be there for a month or two, or longer, before they died, so that you'd get attached to these patients, and then they would die. . . . there were several deaths, and that . . . was very difficult for [Plaintiff]." Defendant had "no support in place to help the staff cope with this kind of experience" or "deal with all these losses." Mr. Lewis testified that "death was something that [Plaintiff] had never really dealt with that well from her childhood" and it was "hard for her, it was difficult."

In 1993, the hospital reorganized "and all of the operating rooms were merged, and four different . . . nursing staffs were merged." Following the merger, Plaintiff was assigned to care for post-anesthesia patients. The reassignment caused stress to Plaintiff, who felt inadequately trained to handle the work. Plaintiff "did not feel comfortable with it, so not adequately trained on the—with the equipment, and she felt it was risking the patients, it was not good patient care." During the restructuring, some nurses were moved from Plaintiff's unit, which caused Plaintiff to "feel badly about being left behind." According to Dr. Roman, Plaintiff characterized the situation as "an injustice [because] they had been promised that they would be moving to the new building, and then they were not going to—they were told they would not be. The ones remaining were not going to the new building. And it was never clear why some people

were picked and others weren't." Plaintiff believed that some of the people picked "were [not] as hard working as she was. So it was a difficult time for her . . . ." Moreover, loss of nursing staff resulted in Plaintiff working longer hours to accomplish the work load. Plaintiff encountered additional stress when a supervisor whom Plaintiff trusted and with whom she had a good relationship lost her position. Frequent changes in Plaintiff's shifts caused Plaintiff to suffer from acute insomnia, which added to her stress.

Although Plaintiff applied for other positions at the hospital, she was not granted any interviews, "[a]nd she became, not only discouraged, but kind of suspicious as to what this whole process was. And she was frustrated, because she was trying to get to a . . . different position that might be less stressful for her." Mr. Lewis confirmed that Plaintiff "felt she was being discriminated against at times." Plaintiff "certainly had no full explanation for why she wasn't getting hired, and she knew of other people with less credentials and qualifications who were being hired with less experience and ability than herself, and that took a lot out of her emotionally."

Dr. Roman testified that Plaintiff experienced particular stress and anxiety over her job security. Because Plaintiff was an experienced nurse, she earned a higher salary than many other nurses, and "there was a feeling that they were trying to get rid of—the nurses at the higher end [of the pay scale]." Plaintiff also felt her assertiveness and willingness to "stand up for herself" and other nurses put her at greater risk of losing her position. According to Dr. Roman, Plaintiff believed Defendant was "scrutinizing her every action, and trying to come up with reasons to terminate her." Mr. Lewis testified that "the advent of managed care had taken full root . . . [and Plaintiff] was almost like a dinosaur in the way, and so she felt that they wanted to get rid of her." Mr. Lewis advised his wife at the time that "[w]hen people want to get rid of you, they have ways of setting you up for that."

In addition to the workplace stress, Dr. Roman and Mr. Lewis testified that events personal to Plaintiff caused her great distress. Specifically, the death of Plaintiff's father approximately eight months before the onset of Plaintiff's disability caused Plaintiff "intense and prolonged" grief. Plaintiff's father died after receiving treatment at Defendant hospital. Mr. Lewis stated Plaintiff had been "very, very close to her father" and she "felt a lot of guilt" about her father's death, in that her father sought treatment at the hospital upon Plaintiff's recommendation. Two weeks after her father died,

**LEWIS v. DUKE UNIV.**

[163 N.C. App. 408 (2004)]

Plaintiff's half-sister also died. Dr. Roman opined that Plaintiff's depression would not have "progressed to this degree without the personal stressors."

Plaintiff was first referred to Dr. Roman in August of 1998 for severe depression. Dr. Roman opined that the duties of Plaintiff's employment substantially contributed to the development of her depression, and that Plaintiff's employment placed her at a greater risk of developing depression than the public in general. When asked to identify specific workplace stressors, Dr. Roman stated that "the amount of stress in the job place just really increased and increased. There was no support system at—in her job, and . . . it got to the point where they were giving the staff on the unit she worked on much more responsibilities than was possible to—to manage." Dr. Roman added that "there was a lot of staff turnover, and in particular, what I guess was labeled unfair turnover, or discriminatory turnover." Dr. Roman noted that, until 2001, Plaintiff "was not able to discuss" her workplace during her therapy with Dr. Roman, as the issue was too emotionally difficult for Plaintiff to address without "breaking down."

When asked to identify specific workplace "triggering factors" for Plaintiff's stress and resulting depression, Mr. Lewis testified as follows:

[Plaintiff] felt that she was being written up for things she didn't do. She's been falsely accused. She was trying to get out of the vacuum of where she was because there was so much intense pressure and stress. Again, there was a dilution of the staff, she's being asked to do a lot more work in a shorter period of time with less personnel. Okay. The game had changed dramatically in terms of expectations. The managed care policies that she was being forced to deal with caused a lot of turmoil in the area where she was . . . . [s]he just didn't get any jobs, and that grew more and more frustrating for her. She felt that something was going on that she had no control over and that she was literally being forced out. And then they created—they built a new building that was going to take the surgical unit over to that area, and they found out that everybody wasn't going, so this created anxiety in her about whether or not she was going to have a job again. . . . One young lady, who was her supervisor at the time, ended up without a job and nowhere to go and was out of work for a while . . . it was a difficult time for a lot of people, not just for [Plaintiff], but for a lot of other people . . . on that staff, and particularly the African-American nurses.

Based on the foregoing and other evidence, the Commission found, *inter alia*, that

8. Plaintiff suffered from depression as a result of her perception that defendant's procedures were unjust and the workload unjustified, her concern about the economic consequences of losing her position and benefits, her fear that she would lose the career which she highly valued, her perception that her skills as a nurse were not appreciated, and her perception that she was being "watched" and was not being treated fairly.

. . . .

12. The Full Commission finds that plaintiff's employment stressors—the personnel conflicts, a demanding workload, job security issues, and her feelings of being undervalued as a professional—did cause or substantially contribute to her depressive disorder. The Commission further finds that these stressors are not characteristic of nursing work as opposed to occupations in general and that her employment as a nurse did not place her at an increased risk of contracting a depressive disorder as opposed to the general public not so employed.

The Commission concluded that Plaintiff failed to prove she sustained an occupational disease and entered an opinion and award denying Plaintiff's claim for benefits. Plaintiff appealed.

Plaintiff's primary contention on appeal is that the Commission erred in finding and concluding that she did not sustain an occupational disease. We conclude Plaintiff failed to present sufficient evidence to support her claim, and we therefore affirm the opinion and award of the Commission.

Appellate review of an opinion and award of the Commission is limited to a determination of (1) whether the findings of fact are supported by competent evidence, and (2) whether the conclusions of law are supported by the findings. *See Smith-Price v. Charter Pines Behavioral Ctr.*, 160 N.C. App. 161, 584 S.E.2d 881, 884 (2003). Where there is " 'evidence of substance which directly or by reasonable inference tends to support the findings, this Court is bound by such evidence, even though there is evidence that would have supported a finding to the contrary.' " *Shah v. Howard Johnson*, 140 N.C. App. 58, 61-62, 535 S.E.2d 577, 580 (2000) (quoting *Porterfield v. RPC Corp.*, 47 N.C. App. 140, 144, 266 S.E.2d 760, 762 (1980)), *disc. review denied*, 353 N.C. 381, 547 S.E.2d 17 (2001).

An occupational disease is defined as "[a]ny disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." N.C. Gen. Stat. § 97-53(13) (2003). "The claimant bears the burden of proving the existence of an occupational disease." *Norris v. Drexel Heritage Furnishings, Inc.*, 139 N.C. App. 620, 621, 534 S.E.2d 259, 261 (2000), *cert. denied*, 353 N.C. 378, 547 S.E.2d 15 (2001).

It is well established that work-related depression or other mental illness may qualify as compensable occupational diseases under appropriate circumstances. *See, e.g., Smith-Price*, 160 N.C. App. at 168, 584 S.E.2d at 888 (affirming award of benefits to a registered nurse who suffered from post-traumatic stress disorder); *Jordan v. Central Piedmont Community College*, 124 N.C. App. 112, 117, 476 S.E.2d 410, 413 (1996) (stating that case law "recognized depression, a mental condition, as an occupational disease and compensable under the [Workers' Compensation] Act"), *disc. review denied*, 345 N.C. 753, 485 S.E.2d 53 (1997); *Pulley v. City of Durham*, 121 N.C. App. 688, 694, 468 S.E.2d 506, 510 (1996) (affirming an award of benefits to a police officer who developed post-traumatic stress disorder and depression). The claimant must first establish, however, that "the mental illness or injury was due to stresses or conditions different from those borne by the general public." *Pitillo v. N.C. Dep't of Envtl. Health & Natural Res.*, 151 N.C. App. 641, 648, 566 S.E.2d 807, 813 (2002). To do so, the claimant must show that her psychological condition, or the aggravation thereof, was (1) "due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment" and that it is not (2) an "ordinary disease[] of life to which the general public is equally exposed." N.C. Gen. Stat. § 97-53(13); *Clark v. City of Asheville*, 161 N.C. App. 717, 589 S.E.2d 384, 386-87 (2003); *Smith-Price*, 160 N.C. App. at 166, 584 S.E.2d at 885. These elements are met "if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally." *Rutledge v. Tultex Corp.*, 308 N.C. 85, 93-94, 301 S.E.2d 359, 365 (1983). "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workman's compensation." *Booker v. Medical Center*, 297 N.C. 458, 475, 256 S.E.2d 189, 200 (1979); *James v. Perdue Farms, Inc.*, 160 N.C. App. 560, 586 S.E.2d 557, 560 (2003).

The issue of whether a claimant's particular occupation places him or her at an increased risk of contracting depression or other mental illness has arisen in several recent cases. In *Woody v. Thomasville Upholstery, Inc.*, 146 N.C. App. 187, 552 S.E.2d 202 (2001), *reversed per curiam*, 355 N.C. 483, 562 S.E.2d 422 (2002), the plaintiff sought compensation for depression she alleged was caused by her employment as a marketing assistant with the defendant company. The evidence tended to show that the plaintiff suffered from pressure and stress at her work, in large measure due to conflict with an abusive supervisor. *Id.* at 189-90, 552 S.E.2d at 204-05. The Industrial Commission awarded the plaintiff benefits, and a divided panel of the Court of Appeals affirmed the opinion and award. The Court of Appeals concluded that plaintiff's employment exposed her to a greater risk of contracting depression than the public generally, in that it involved

> (1) an extremely stressful and verbally abusive relationship with her emotionally unstable supervisor, which caused plaintiff to feel demeaned, embarrassed, humiliated, and worthless; and (2) a workplace environment in which plaintiff justifiably felt powerless over the situation and betrayed by her employer because her employer appeared to care more about the supervisor's financial value to the company than her abusive treatment of employees.

*Id.* at 201, 552 S.E.2d at 211.

> Judge Martin dissented from the majority opinion, stating that

> [n]otwithstanding the fact that plaintiff's job-related stress caused her depression and aggravated her fibromyalgia, such facts cannot support the conclusion that plaintiff's mental and physical conditions were occupational diseases as defined by the statute. The findings indicate merely that plaintiff suffered from depression and fibromyalgia after being placed in the unfortunate position of working for an abusive supervisor, which can occur with any employee in any industry or profession, or indeed, in similar abusive relationships outside the workplace. Therefore, I do not believe plaintiff's conditions can be construed as "characteristic of and peculiar to" her particular employment; they are ordinary diseases, to which the general public is equally exposed outside the workplace in everyday life.

*Id.* at 202, 552 S.E.2d at 211 (Martin, J., dissenting). Our Supreme Court adopted Judge Martin's dissent and reversed the decision of the Court of Appeals.

**LEWIS v. DUKE UNIV.**

[163 N.C. App. 408 (2004)]

This Court examined *Woody* in the context of an award of benefits by the Commission to a registered nurse who suffered post-traumatic stress disorder arising from her employment with the defendant psychiatric hospital. *See Smith-Price*, 160 N.C. App. at 161, 584 S.E.2d at 881. The evidence tended to show that the plaintiff worked with "patients whose problems ranged from being suicidal, homicidal, or otherwise disturbed due to mental disease and/or substance abuse." *Id.* at 162, 584 S.E.2d at 882. In addition, the defendant psychiatric hospital had administrative and staffing problems that created a "chaotic atmosphere." *Id.* at 164, 584 S.E.2d at 884. The plaintiff also encountered stress and conflict in dealing with her co-workers and supervisors. The Commission moreover found that "[m]any incidents occurred at [defendant hospital] that caused stress to plaintiff, including plaintiff's concern about the safety of the [patients], improper staffing, and being instructed to clock out while still being required to continue working. Plaintiff received no support from supervisors, which caused her a great deal of stress." *Id.* at 163, 584 S.E.2d at 883. The Commission concluded that the plaintiff's employment placed her at a greater risk for contracting post-traumatic stress disorder than members of the general public and awarded her benefits. Upon appeal, this Court examined the precedent set forth in *Woody* and affirmed the award of benefits to the plaintiff as follows:

In the present case we find that plaintiff presented evidence which supports the Commission's determination that her mental disorders stem from a job which has unique stresses to which the general public is not exposed. Plaintiff was caring for the mentally ill whose problems ranged from the suicidal to those who were severely anxious or depressed. There had already been one death at [defendant psychiatric hospital] which resulted in local and national news coverage of the conditions at [the hospital] under which plaintiff labored. This case presents a situation far more severe than merely an employee's relationship with an abusive supervisor as was the case in *Woody*.

We believe plaintiff worked in an atmosphere permeated with stress and this case is much more analogous to *Pulley* due to the fact that she worked with an aberrant population where treatment errors could (and did at least once) result in death. These are not common workplace stresses.

Thus we hold that the Commission could properly find, on the record before it, that plaintiff suffered from a compensable

occupational disease, even though evidence to the contrary existed.

*Id.* at 171, 584 S.E.2d at 887-88.

More recently, this Court addressed the issue of whether a mental disease was due to conditions "characteristic of and peculiar to" employment in the case of *Clark v. City of Asheville,* 161 N.C. App. 717, 589 S.E.2d 384 (2003). There, a firefighter with the City of Asheville filed a claim for workers' compensation benefits, alleging he had suffered an occupational disease, post-traumatic stress disorder, after failing a driving test and being told he could no longer drive fire trucks for the city. The Commission denied the plaintiff's claim, noting that although "[t]he position of firefighter may be considered inherently dangerous and exposes firefighters to many traumatic events not usually witnessed by the general public," the plaintiff "fail[ed] to show that such events were factors significantly contributing to [his] psychological problems, including [post-traumatic stress disorder], depression and anger." *Id.* at 719, 589 S.E.2d at 386. The Commission further found that

[f]ailing an employment test and perceiving demotion are not uncommon circumstances in the workplace. Such occurrences are not characteristic to employment as a firefighter, and employment as a firefighter does not increase one's risk of experiencing stress as a result of failing a test or perceiving demotion. Neither plaintiff's [post-traumatic stress disorder] nor his mental state in dealing with the driver's test or [his supervisor] were the result of any traumatic event or events characteristic of employment as a firefighter.

*Id.* at 720, 589 S.E.2d at 386. On appeal, we affirmed the Commission's denial of benefits, concluding that the plaintiff failed to show that his psychological condition was due to causes and conditions characteristic of and peculiar to his employment as a firefighter. We agreed with the Commission that "[t]he giving of tests . . . can be expected in any work setting" and that "working for an abusive supervisor . . . 'can occur with any employee in any industry or profession.' " *Id.* at 721, 589 S.E.2d at 387 (quoting *Woody,* 146 N.C. App. at 202, 552 S.E.2d at 211 (Martin, J., dissenting)).

In the instant case, we agree with the Commission that Plaintiff presented insufficient evidence to demonstrate that the workplace stressors contributing to the development of her depression were causes and conditions characteristic of and peculiar to her position

as a registered nurse. Although nursing can and may have exposed Plaintiff to traumatic events and unique stress unlike that experienced by the general public, Plaintiff, like the plaintiff in *Clark*, failed to show that it was such untoward exposure in her employment that caused her disability. The testimony by Dr. Roman and Mr. Lewis tended to show that the workplace stressors contributing to Plaintiff's depression included (1) a demanding workload; (2) the lack of support system at her employment; (3) staffing decisions Plaintiff considered unfair or discriminatory; (4) her perception that she was undervalued at her work; (5) management restructuring and changes in hospital policies; (6) changes in shifts contributing to insomnia; and (7) Plaintiff's anxiety over her job security. None of these stressors is characteristic to or peculiar to the nursing profession; rather, they are general stressors common to many workplaces. Thus, Plaintiff failed to prove that her employment placed her at a greater risk of developing depression than the public generally. *See Rutledge*, 308 N.C. at 93-94, 301 S.E.2d at 365.

Nonetheless, Plaintiff argues the Commission failed to properly evaluate Plaintiff's evidence in the context of the nursing profession, where the "work literally involved matters of life and death." She contends her sensitivity to death, and her exposure to the terminally ill patients substantially contributed to the development of her depression. We must disagree. Although Plaintiff's exposure to terminally ill patients could be considered a stressor characteristic of and peculiar to the nursing profession, *see Smith-Price*, 160 N.C. App. at 171, 584 S.E.2d at 888 (stating that working with an aberrant population where treatment error could result in death did not involve common workplace stresses), she failed to prove that her work with such patients substantially contributed to her illness. Plaintiff stopped working with terminally ill patients approximately six years before she ended work at Defendant hospital. Given the length of time between Plaintiff's exposure to the terminally ill patients and the onset of her disability, the Commission could properly find that Plaintiff's exposure to death "was not a significant [factor] in the development of [P]laintiff's depressive disorder."

Plaintiff further contends it was her deep concern for her patients' welfare that was the underlying factor placing intense stress on Plaintiff. Plaintiff, however, presented inadequate evidence to support her contention. When asked to articulate the workplace stressors identified by Plaintiff, Dr. Roman and Mr. Lewis focused almost exclusively on issues of Plaintiff's dissatisfaction with staffing and

changes in management policy, anxiety over job stability, perceived discrimination, and the general demanding nature of the job. Given this evidence, the Commission could properly find and conclude that "[P]laintiff's employment stressors—the personnel conflicts, a demanding workload, job security issues, and her feelings of being undervalued as a professional" were "not characteristic of nursing work as opposed to occupations in general and that her employment as a nurse did not place her at an increased risk of contracting a depressive disorder as opposed to the general public not so employed."

Finally, Plaintiff contends the Commission failed to give proper weight to the testimony by Dr. Roman. It is well established, however, that the Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Matthews v. City of Raleigh*, 160 N.C. App. 597, 586 S.E.2d 829, 833 (2003). Further, although Dr. Roman testified that Plaintiff's employment placed her at greater risk of developing depression, she did not identify specific factors unique to Plaintiff's job that led to the development of Plaintiff's depression. Moreover, Dr. Roman testified that Plaintiff did not speak of her employment with Defendant until three years after she left her position. Under these circumstances, the Commission could properly find that, contrary to Dr. Roman's assertions, Plaintiff's employment did not place her at an increased risk of contracting a depressive disorder.

We therefore affirm the opinion and award of the Commission.

Affirmed.

Judges McGEE and TYSON concur.