* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 * * * * * * * * * * * EVIDENTIARY MATTERS
At and subsequent to the hearing before the Deputy Commissioner, the plaintiff submitted the following, which were admitted into the record: *Page 2 
 a. Business Manager Job Description, marked as Plaintiff's Exhibit (1);
 b. Departmental Business Manager III Job Description, marked as Plaintiff's Exhibit (2);
 c. Business Manager Position Overview, marked as Plaintiff's Exhibit (3);
 d. Correspondence dated February 14, 2002, marked as Plaintiff's Exhibit (4);
 e. Correspondence with attachments dated March 6, 1998, marked as Plaintiff's Exhibit (5); and,
 f. Packet of Documents relating to Budgetary Shortfalls with the Cape Hatteras project, marked as Plaintiff's Exhibit (6).
Also at the hearing before the Deputy Commissioner, the defendant submitted a Summary of Disability Benefits Received by Plaintiff, which was admitted into the record, and marked as Defendant's Exhibit (1).
 * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law, the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the Commission has jurisdiction of the parties and of the subject matter.
2. On or about January 8, 2003, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. The parties stipulated at the hearing that the plaintiff's disability date is February 1, 2003. *Page 3 
3. At all times relevant herein, the defendant-employer was the self-insured employer at risk.
4. The plaintiff's average weekly wage was $1,213.97, resulting in the maximum compensation rate for the year 2003 of $674.00 per week.
5. The plaintiff did not cause the budget deficits or budgetary errors regarding the budgets for the Duke University Marine Lab or its vessels, and including the research vessel, Cape Hatteras.
6. The parties have submitted a Packet of Medical Records, which was admitted into the record, and marked as Stipulated Exhibit (2), and A Packet of Industrial Commission Forms, which was admitted into the record, and marked as Stipulated Exhibit (2).
7. The issues to be determined are whether the plaintiff contracted a compensable occupational disease, and if so, to what indemnity and medical benefits, if any, is she entitled, and if this claim is found to be compensable, whether the defendant is entitled to a credit for long-term disability benefits paid to the plaintiff pursuant to a wholly employer-funded plan.
 * * * * * * * * * * *
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was fifty-eight years of age at the time of hearing before the Deputy Commissioner, and was not employed in any capacity.
2. The plaintiff began her employment with the defendant-employer in 1972 as an accounting clerk, and was promoted to finance manager in 1977. In 1985, the plaintiff was *Page 4 
promoted to business manager of the Duke University's Marine Laboratory (DUML). Initially, the plaintiff's work in this position involved the following duties:
 a. Managing and coordinating the business and financial activities to include purchasing, shipping, receiving, grant administration, financial accounting for gifts and endowments, and maintaining accurate records;
 b. Reviewing financial and related controls, policies and procedures to ensure compliance with defendant's guidelines, policies, and business and finance practices;
 c. Maintaining contact with university departments to ensure coordination and timeliness of DUML reports, action and procedures consistent with defendant's policies and requirements;
 d. Preparing and monitoring annual operational and sponsored programs budgets, analyzing monthly statements and reports, preparing summaries for the DUML director, preparing special reports on financial operations and status of DUML accounts as requested for review by defendant's administration;
 e. Maintaining and providing safety records and reports ensuring compliance with defendant, Federal and State regulations; and,
 f. Performing various personnel actions including hiring and promoting employees, evaluating performance, and coordinating and establishing work and vacation schedules.
3. In 1993, the human resources job and associated duties were transferred from the director's office at DUML to the business manager's office. Because of the increase in duties, an *Page 5 
extra half-time employee was added to the plaintiff's office. The human resource duties included: approving all time cards; handling DUML's service awards banquet; handling grievance and disciplinary actions; communicating with employees regarding benefits; conducting DUML's annual benefits fair; maintaining a job applications pool; conducting exit interviews; maintaining forms and assisting with accounts at the credit union; managing workers' compensation claims; and communicating with defendant-employer's legal counsel regarding any legal issues, including appearing for court as required.
4. In July 1999, a co-employee was relieved of her duties as Auxiliary Services Manager at DUML. This position was responsible for the dining hall, dormitories, and special functions. Prior to July 1999, the auxiliary oversight had been a part-time function of employees at DUML with the duties shifting between them over time. Associate Dean Dr. John Sigmon recommended that the replacement report directly to the plaintiff in the business manger's office, an arrangement that mirrored operations at the defendant-employer's Durham campus. The plaintiff was informed that for approximately six months she would perform the duties of Auxiliary Services Manager until a replacement could be hired. However, it was not until May 2002 that a replacement was secured with the transfer of Dominick Brugnolotti from Durham. Additionally, according to the plaintiff, Mr. Brugnolotti had no prior experience in auxiliary services and, therefore, she had to train him. This training continued until the time the plaintiff was medically excused from work in January 2003.
5. According to Dr. Michael Orbach, director of DUML, when he came to that position, the plaintiff had four staff members, and for most of the period in question had 3.75 staff members. When the added responsibilities of auxiliaries were added, Dr. Orbach and the *Page 6 
defendant contend that the plaintiff had adequate resources available to her in the business office to perform the functions asked of her and her office.
6.The plaintiff contends that from July 1999 until May 2002, she performed the equivalent of two full-time managerial jobs, although she does admit willingly assuming the responsibilities of Auxiliary Services Manager with no promised reduction in her workload as business manager. Also, in the fall of 2001, the defendant-employer hired a dining hall manager to assist with the burden of the dining hall and the auxiliary functions. The plaintiff spent approximately sixty percent of her time performing duties associated with her Business Manager job, and forty percent with duties relating to her Auxiliary Services Manager job. In order to perform all of her duties, the plaintiff further contends that she had to consistently work overtime and that, more than other staff members, she maintained administrative functions of DUML during the most difficult transition in its history. The plaintiff further notes that the quality of her work from July 1999 into 2002 was such that her supervisors nominated her for the defendant-employer's presidential award.
7. Subsequent to the plaintiff being medically excused from work in January 2003, the defendant-employer restructured DUML, and hired two full time mangers for the duties the plaintiff had been performing. The plaintiff asserts that this supports her contention that she had been performing the work of two persons for nearly three years. However, the defendant notes that its restructuring of DUML and retention of a full time manager was the product of an expansion of the Auxiliary Manager with numerous additional duties associated with it. Thus, defendant contends that the present manager performs more duties as the Auxiliary Manager than ever performed by the plaintiff, her office members, or her predecessors. *Page 7 
8. In the fall of 1999, the plaintiff discovered a $250,000.00 shortfall in the budget for the research vessel, Cape Hatteras. The Cape Hatteras is owned by the National Science Foundation and is operated by the Duke/UNC Oceanographic Consortium. DUML has a general administrative oversight responsibility of the vessel. The plaintiff reported her finding to Dr. Joe Ustach, who is responsible for preparing the budget. The plaintiff contends that Dr. Ustach responded that his budget was correct and that the National Science Foundation required him to prepare it in that manner. Despite what she perceived as a lack of cooperation from Dr. Ustach, the plaintiff reported the accounting error to Dr. Orbach and her immediate supervisor, Mr. Jim Haggard. According to the plaintiff, Mr. Haggard then instructed her maintain a focus on the budget problem until it was solved. Thereafter, the plaintiff worked an extra ten to fifteen hours per week on the budget problem. Additionally, the plaintiff contends that on
one occasion Mr. Haggard telephoned her and offered what she interpreted as a veiled threat stating, "people lose their job over things like this."
9. The defendant notes that when the Cape Hatteras budget problem was discovered, the plaintiff alone was not tasked with solving it, but that Dr. Ustach, Mr. Haggard, and Mr. Quentin Lewis were also tasked with determining how the problem occurred and rectifying it. Additionally, Dr. Bruce Corliss, the principal investigator of the Cape Hatteras program, held a series of meetings regarding the budget problem with Mr. Haggard, Mr. Lewis, Dr. Ustach, and the plaintiff.
10. Subsequent to March 2001, the plaintiff's staff was reduced by one, resulting in her having the assistance of only two and a half employees. In the spring of 2002, the defendant assigned the plaintiff the duty of reconciling all accounts receivable for DUML to make certain *Page 8 
each was collectible. Prior to that spring, Accounting Services on the main campus in Durham had done this reconciliation for DUML.
11. Also in the spring of 2002, the plaintiff began experiencing symptoms and problems that adversely affected her ability to perform her job. These symptoms and problems included an uncontrolled blood pressure, depression, anxiety, the inability to focus on tasks, and crying spells. In March 2002, the plaintiff notified Dr. Orbach that she felt burned out, that her workload was too large, and that she needed assistance. Around that time, Dr. Orbach was also made aware by his assistant of at least one occasion where the plaintiff had an uncontrolled crying spell at work.
12. On July 23, 2002, the plaintiff sought medical treatment at the office of her family physician, Dr. James Crosswell, and was examined by Jack Orton, P.A. At that time, the plaintiff was tearful, and reported being under severe stress at work. Dr. Crosswell's medical notes also reference that the plaintiff was experiencing significant stress from family issues. The plaintiff was prescribed Paxil, which helped control her symptoms, but did not provide complete relief.
13. By January 2003, the plaintiff's symptoms had worsened and she returned to Dr. Crosswell's office on January 8, 2003. At that time, the plaintiff was emotionally upset, tearful, and concerned that her job was too stressful to tolerate. P.A. Orton medically excused the plaintiff from work due to her anxiety and depression, which he related to her work with the defendant-employer, and prescribed Lexapro. The plaintiff continued working until January 31, 2003, and has not worked in any capacity for any employer since that date.
14. On February 20, 2003, the plaintiff returned to Dr. Crosswell's office and reported that leaving her job had been upsetting. The plaintiff also requested that she be *Page 9 
medically cleared to return to work. Dr. Crosswell referred the plaintiff to Terry Robertson, a certified social worker, for treatment options. The plaintiff had received treatment from Ms. Robertson for six months in 1999 for issues relating to the plaintiff's pregnancy at the age of thirteen and her having to give up her son for adoption. At the end of the plaintiff's prior treatment in December 1999, Ms. Robertson was of the opinion that the plaintiff was fine and no longer needed therapy. In 2003, Ms. Robertson diagnosed the plaintiff as having major depression and found her to be borderline suicidal. Because of the plaintiff's condition, Ms. Robertson referred her to psychiatrist Dr. Barton Lewis on February 25, 2003.
15. Dr. Lewis, following his examination of the plaintiff on February 25, 2003, diagnosed the plaintiff as having a major depressive disorder with near psychotic symptoms. He prescribed high dosages of anti-depressant and anti-psychotic medications. Dr. Lewis is of the opinion that the plaintiff's depressive disorder was caused by her particular employment conditions with the defendant-employer, including performing two full-time positions for almost three years. Dr Lewis is also of the opinion that the plaintiff's work with the defendant-employer placed her at greater risk of contracting a major depressive disorder as opposed to the general public. According to Dr. Lewis, the plaintiff remained totally disabled from all employment at the time of his deposition.
16. The defendant contents that the opinion testimony of Dr. Lewis should be given little weight. In support of this contention, the defendant notes that Dr. Lewis signed, but did not write, a correspondence in support of the plaintiff's workers' compensation that had been written by the plaintiff. Also, at his deposition, Dr. Lewis testified that regarding increased risk, he was unsure if there was really a yes or no answer. Moreover, Dr. Lewis testified that what is most peculiar to the plaintiff is a personality trait relating to the level of her loyalty and identification *Page 10 
with her employment, and not the employment or job itself. As for Dr. Lewis's causation and increased risk opinions, the defendant notes that Dr. Lewis testified that he has treated numerous patients that had workplace-related anxiety and depression.
17. Ms. Robertson is also of the opinion that the plaintiff's depression was the result of her job with the defendant, specifically the substantially increased workload she had for almost three years and the reduction in her staff during that time. Additionally, Ms. Robertson was of the opinion that the plaintiff's job with the defendant placed her at greater risk than members of the general public for developing a major depressive disorder. Ms. Robertson has was also of the opinion that the plaintiff's issues with giving up her child for adoption was not a significant contributing factor in her major depression that developed in July 2002. Finally, Ms. Robertson, at the time of her deposition, was of the opinion that the plaintiff was unable to return to work at the time; however, Ms. Robertson believed the plaintiff will improve.
18. As with Dr. Lewis, the defendant contends that the opinions of Ms. Robertson should be given little weight. In support of this contention, the defendant notes that Ms. Robertson admitted to being assisted by the plaintiff and her husband in drafting correspondence to the defendant is support of the plaintiff's claim. As for Ms. Robertson's causation and increased risk opinions, the defendant notes that Ms. Robertson testified that she has treated numerous patients for work-related stress, depression, and anxiety due heavy workloads, fears of losing their jobs, and the lack of a support system at their places of employment.
19. The plaintiff's first treating physician in this claim was Dr. Crosswell, who is of the opinion that the plaintiff's depression and anxiety were the result of her job with the defendant, specifically the increased work-load she had over an extended period of time. Dr. *Page 11 
Croswell is of the opinion that the plaintiff's job with the defendant placed her at a greater risk for developing these conditions as opposed to members of the general public.
20. As with Dr. Lewis, and Ms. Robertson, the defendant contends that the opinions of Dr. Croswell should be given little weight. In support of this contention, the defendant notes that Dr. Crosswell also received assistance from plaintiff in writing a correspondence to defendant in support of her claim. As for Dr. Crosswell's causation and increased risk opinions, the defendant notes that Dr. Crosswell testified that he has treated many patients who have complained about work-related stress and anxiety due to increased workloads and job security concerns and who have suffered depression.
21. Although it is clear from the record that the plaintiff's job did cause her to experience stress and depressive episodes, the testimony by her treating physicians regarding the issue of increased risk is afforded little weight by the Commission, as each of the experts testified that they treat numerous patients in different professions for job-related depression stemming from the same work-related stressors as the plaintiff: heavy workloads, budgets, lack of support, and job security concerns. Thus, considering all of the evidence presented, the Commission finds that there was nothing unusual about the plaintiff's job with the defendant, and nothing unusual in regard to what was expected of her as compared to any person similarly situated. The stress of heavy workloads, budgets, lack of support, and job security concerns are in no way unique to the plaintiff's position as a business manager. The work the plaintiff was asked to perform by the defendant, though difficult and challenging at times, was the same kind of work any similarly-situated business manager would be required to do.
22. The Full Commission finds that the plaintiff's employment as a business manager did not place her at an increased risk of developing a mental disorder as compared to the general *Page 12 
public not so employed. Thus, the plaintiff has not proven by the greater weight of the evidence that her mental disorders are compensable occupational diseases under the provisions of the Workers' Compensation Act.
23. The plaintiff has been receiving long-term disability benefits from the defendant-employer in the monthly gross amount of $3,165.00. These disability benefits are paid to plaintiff pursuant to an employer-funded plan. As of the date of the hearing in the matter, the plaintiff was receiving long-term disability benefits and Social Security Disability benefits.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co., 79 N.C. App. 324, 331,339 S.E. 2d 490, 494 (1986). Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) the disease must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) the disease cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458, 468;256 S.E. 2d 189, 196 (1979).
2. Mental illness which results from failing to perform one's job duties, lack of a support system at the employment, the perception of being undervalued, the demanding nature of the employment, and/or working for an abusive supervisor is not compensable because it is not characteristic of and peculiar to any industry or profession and can occur outside of the *Page 13 
employment. Woody v. Thomasville Upholstery Inc., 355 N.C. 483,562 S.E.2d 422 (2002); Lewis v. Duke University, 163 N.C. App. 408,594 S.E.2d 100 (2004); Clark v. City of Asheville, 161 N.C. App. 717,589 S.E.2d 384 (2003).
3. In the present case, mental disorders stemming from the stress of heavy workloads, budgets, lack of support, and job security concerns are in no way unique to plaintiff's position as a business manager, and "to hold these conditions to be occupational diseases compensable under N.C. Gen. Stat. § 97-53(13) . . . stretches beyond the intent of the Workers' Compensation Act. Woody at 202, 212. Under Woody and Lewis, the plaintiff did not prove that her mental illness is due to causes and conditions which are characteristic of and peculiar to her employment.Woody and Lewis, supra.
4. The plaintiff did not contract a compensable occupational disease and is, therefore, not entitled to compensation under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §97-53(13).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. The plaintiff's claim for compensation under the North Carolina Workers' Compensation Act must be, and the same is hereby, DENIED.
2. Each side shall pay its own costs.
 This 20th day of January 2006. *Page 14 
 S/_____________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________________ THOMAS J. BOLCH COMMISSIONER
 S/_____________________ BUCK LATTIMORE CHAIRMAN *Page 1