***********
Upon review of the competent evidence of record with reference to the errors assigned and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The issues presented for hearing before the Deputy Commissioner were:
 ISSUES
1. Whether Plaintiff developed a compensable occupational disease on or about March 13, 2000 while working with Defendant-Employer?
 2. Whether Plaintiff's depression is compensable? *Page 2 
3. To what compensation, if any, is Plaintiff entitled?
 *********** EXHIBITS
The following document was accepted into evidence as a stipulated exhibit:
 • Exhibit 1: Plaintiff's medical records
The following document was accepted into evidence as a Plaintiff's exhibit:
 • Exhibit 1: Various documents submitted by Plaintiff
The following document was accepted into evidence as a Defendants' exhibit:
 • Exhibit 1: Industrial Commission forms and filings
 *********** RULING ON MOTION TO DISMISS
Defendants filed a Motion to Dismiss with the Office of the Executive Secretary on or about June 3, 2005. Plaintiff, through his then-counsel, responded, and Executive Secretary Weaver filed an Order on July 26, 2005 referring the Motion to Dismiss to the Deputy Commissioners Section for the setting of a hearing. Defendants renewed their Motion to Dismiss before Deputy Commissioner Harris. Plaintiff, through his then-counsel, had withdrawn a hearing request effective November 2, 2001 and had not re-filed for a hearing, through his different counsel, until February 25, 2005. As such, Defendants contended that Plaintiff's claim should be dismissed with prejudice in the Commission's discretion, for failure to prosecute, pursuant to Rule 613(2)(c). By Order filed May 24, 2007, Deputy Commissioner Harris, in his discretion, denied Defendants' Motion to Dismiss. The Full Commission hereby affirms this ruling.
 *********** EVIDENTIARY RULINGS
1. Defendants submitted, post-hearing, a document entitled "UPS Essential Job Functions (2005)." Deputy Commissioner Harris had inquired at the hearing of this matter as to whether a job description was available, and none was submitted at the hearing. The post-hearing submission was untimely, and Plaintiff did not have the opportunity to review it at the hearing and testify as to whether it was an accurate representation of his job duties. Further, the submission does not appear to cover the relevant timeframe. As such, an objection to the admission of this document into evidence was SUSTAINED by Deputy Commissioner Harris. The Full Commission affirms this evidentiary ruling. *Page 3 
2. The Deputy Commissioner received responses to written questions propounded to Dr. Kim E. Koo and Dr. Antonio Cusi. Said questions and responses were served on both parties. The Deputy Commissioner drafted the questions after receipt of Defendants' proposed questions to medical providers. These questions and responses are admitted into evidence.
 ***********
Based upon all of the competent, credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. The parties are correctly designated in the caption above and are subject to the North Carolina Workers' Compensation Act.
2. The Industrial Commission has jurisdiction to hear and rule on this claim. 3. At all relevant times, the employee-employer relationship existed between Plaintiff and Defendant-Employer.
 4. Defendant-Carrier was the carrier on the risk in this claim. *Page 4 
5. Plaintiff appeared pro se at the hearing of this matter. Since filing his Form 18 in or about March of 2000, Plaintiff has retained three different attorneys, all of whom later withdrew from representation.
6. At the time of hearing before the Deputy Commissioner, Plaintiff was 49 years old, having a date of birth of August 5, 1958. He started working for Defendant-Employer in 1981 and became a package truck driver in 1994. Prior to working with Defendant-Employer, Plaintiff served in the U.S. Army from 1977-79.
7. As a driver, Plaintiff delivered to and picked up packages from residences and businesses in and around Fayetteville, North Carolina. The packages were up to 170 pounds in weight and 180 inches in combined length and girth. About 75 percent of Plaintiff's deliveries and pick-ups were to and from businesses. The typical size of a residential package was about one foot by two feet with a weight of about 25 pounds, while business packages tended to be larger. A dolly was available for delivering large packages. Plaintiff handled about 300 packages per day.
8. In the late 1990s, Defendant-Employer initiated a new tracking system for packages called "DIAD." A DIAD board is a hand-held cordless device which digitally scans packages at delivery and pickup and allows package recipients to provide their digital signature for confirmation. Drivers could also input data through a keypad. Plaintiff did not key in most of his packages.
9. A short time after he began using DIAD, Plaintiff testified that his hands began to tremble. Sometime in or about 1999, Plaintiff's wrists started to bother him, and he would ice them to try to obtain relief from the pain. *Page 5 
10. On March 13, 2000, an incident occurred in which Plaintiff dropped several packages he was carrying at work, because his wrists gave out .
11. The next day, March 14, 2000, Plaintiff saw Lisa Oakley, a Physician's Assistant with U.S. Healthworks in Fayetteville. He complained of bilateral wrist pain gradually coming on over one year and culminating in the box-dropping incident the day before. PA Oakley diagnosed bilateral wrist strain and prescribed a Medrol Dose Pack and wrist splints. She put Plaintiff on light duty work status for 10 days.
12. On March 24, 2000 at a return visit with PA Oakley, Plaintiff's wrist pain was improving, and he was released to full duty with splints. However, by March 27, 2000 Plaintiff's bilateral wrist pain had worsened again, and Dr. Robert G. Fletcher with U.S. Healthworks placed Plaintiff on another week of light duty status.
13. On April 3, 2000, Dr. Fletcher discharged Plaintiff from U.S. Healthworks' care.
14. On July 5, 2000, Plaintiff's bilateral wrist pain returned when he was pushing boxes onto a dock at work.
15. Plaintiff again saw PA Oakley on July 6, 2000, and she diagnosed bilateral wrist pain and tenosynovitis.
16. On July 27, 2000, upon referral from U.S. Healthworks, Plaintiff underwent NCV testing with Dr. Lucas Van Tran, a neurologist. Dr. Van Tran interpreted the results as consistent with moderately severe bilateral carpal tunnel syndrome. Dr. Fletcher agreed with the diagnosis of bilateral carpal tunnel syndrome and placed Plaintiff on light duty work status again, through July 31, 2000.
17. Plaintiff saw Dr. Koo, a neurosurgeon, for the first time on August 14, 2000, upon Dr. Fletcher's referral. Plaintiff provided a history of a left wrist sprain in 1997 when he slipped *Page 6 
and fell with his hand extended, and the March 13, 2000 and July 6, 2000 work incidents. Plaintiff further detailed that he was waking up at night with paresthesias and pain in his hands and wrists. Plaintiff reported that pain radiated from his wrists to the anterior forearms. Plaintiff also reported paresthesias in all of his fingers. Dr. Koo reviewed the NCS findings, found positive Tinel's signs at both wrists and diagnosed bilateral carpal tunnel syndrome and tendinitis of the medial and posterior wrists. Dr. Koo recommended bilateral carpal tunnel releases.
18. On September 5, 2000, Plaintiff underwent a left carpal tunnel release with Dr. Koo. On November 13, 2000, Plaintiff underwent a right carpal tunnel release with Dr. Koo.
19. After each release procedure, Plaintiff was out of work for three to four weeks, followed by a light duty period of about one and a half months, during which Plaintiff worked about 25-30 hours per week.
20. By March of 2001, Plaintiff had returned to full duty with Defendant-Employer.
21. Plaintiff continued working as a package truck driver until he was terminated on June 12, 2002 for alleged reasons unrelated to this claim.
22. Plaintiff has since worked for Swift Transportation as a truck driver from November of 2002 through April of 2006, and for FedEx as a truck driver from August of 2006 through December of 2006. As of the date of the hearing, Plaintiff had not sought employment since he left FedEx and was not working.
23. Plaintiff presented twice to an emergency room in July of 2006, with bilateral swelling and pain in his hands.
24. As of the hearing, Plaintiff testified that his wrists still hurt, and that he has occasional cramping in his palms and fingers. *Page 7 
25. As of the hearing, Plaintiff also was suffering from depression, which he contended was related to his employment with Defendant-Employer. Plaintiff was taking Prozac for his depression, and he was receiving counseling, through the Veterans Administration, with Dr. Antonio Cusi, a psychiatrist in Fayetteville. Plaintiff testified, his depression began in 1999 and resulted from perceived racial discrimination and harassment directed at him in his employment with Defendant-Employer. Plaintiff further testified that it had taken him 14 years after he started with Defendant-Employer in 1981 to advance to a full-time driver position, during which period he was repeatedly passed over for promotion.
26. Plaintiff has a prominent one-inch scar at the base of the palm of each of his hands, from the carpal tunnel releases.
27. Because the Plaintiff was not represented by counsel, the Deputy Commissioner elected to forego depositions of doctors and instead presented written questions to Dr. Koo. The questions were accompanied by a statement of facts intending to describe Plaintiff's job duties with Defendant-Employer and his medical history. The Deputy asked Dr. Koo to render opinions after considering Plaintiff's medical records and the fact summary provided.
28. The Deputy Commissioner asked Dr. Koo to provide her answers "to a reasonable degree of medical certainty, that is, what is probable, but not merely possible." In response to the question of whether Plaintiff's bilateral carpal tunnel syndrome was "substantially caused, aggravated and/or accelerated" by Plaintiff's job with Defendant-Employer, Dr. Koo responded, "[r]epetitive use of the hands and wrist will increase the risk and cause tenosynovitis and nerve compression. Mr. Hunter's job was consistent with above." However, Dr. Koo was not given a completely accurate description of what Plaintiff's specific job duties involved. The Deputy Commissioner's statement of facts suggested that a driver "would input data for each package *Page 8 
via a keypad on the device [DIAD]." However, the information from most of the packages that Plaintiff handled would be scanned into the DIAD device and did not involve keying in data. Moreover, Plaintiff did not offer evidence in the statement of facts, the medical records available to Dr. Koo or in the record detailing the specific requirements of his job duties that would show how he used his hands repetitively. Plaintiff testified that the delivery of packages required him to drive, pull/push and carry packages, that each package required a single scan and that sometimes he would have to key in the data. Therefore, little weight is given to Dr. Koo's causation and increased risk opinions.
29. Because she has not seen Plaintiff since early 2001, Dr. Koo was unable to comment as to whether Plaintiff has reached maximum medical improvement for his bilateral wrist condition or as to whether he remains under any activity restrictions.
30. The Deputy Commissioner also presented written questions to Dr. Cusi. Dr. Cusi attributed Plaintiff's depression to "perceived [racial] discrimination" that Plaintiff experienced at his job with Defendant-Employer, as related by Plaintiff in his initial appointment with Dr. Cusi on January 19, 1999. Dr. Cusi wrote, "[t]he stress that [Plaintiff] complained [of] did not arise from the wrist condition but the reports of harassment and work expectations he received despite his wrist condition." The Full Commission finds that the triggering event for Plaintiff's depression is not characteristic of his work duties as opposed to occupations in general and his employment did not place him at an increased risk of contracting depression over the general public not so employed.
31. As of the 2000-2001 timeframe, Plaintiff was paid about $18.75 per hour in his job as a package truck driver with Defendant-Employer. The Form 22 provided by Defendants, which Plaintiff testified was accurate, shows that Plaintiff earned $41,949.18 in the year prior to *Page 9 
the onset of his bilateral wrist condition. The Form 22 also shows that Plaintiff missed two 8-day periods from work during that time. Subtracting these two 8-day periods yields a divisor of 49.71 weeks. As such, Plaintiff's average weekly wage is $843.88, with a compensation rate of $562.61.
 ***********
Based upon the foregoing Findings of Fact the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally. In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in the disease's development. Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359
(1983). Plaintiff has failed to prove by the greater weight of the evidence that his job duties with Defendant-Employer placed him at an increased risk, over that faced by the general public, of developing carpal tunnel syndrome or that his job duties caused him to develop bilateral carpal tunnel syndrome. Dr. Koo's causation and increased risk opinions were in response to a set of assumed facts that were not an accurate description of how Plaintiff performed his job duties and her opinions have been accorded little weight. There is also insufficient evidence establishing that Plaintiff's specific job duties involved the type of repetitive use of his hands, which would significantly contribute to the development of carpal tunnel syndrome. Therefore, Plaintiff has not established that he contracted an occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's depression is not compensable. Plaintiff's depression resulted from years of perceived racial discrimination and harassment on the job. There is no showing on this *Page 10 
record that Plaintiff's job placed him at an increased risk, over that faced by the general public, of developing depression. Rutledge v. TultexCorp., 308 N.C. 85, 301 S.E.2d 359 (1983); Lewis v. Duke Univ.,163 N.C. App. 408, 594 S.E.2d 100 (2004). N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for compensation due to an occupational disease is DENIED.
2. Each party shall pay its own costs.
3. This the __ day of December 2008.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1