CYNTHIA SMITH-PRICE, Plaintiff-Employee v. CHARTER PINES BEHAVIORAL
CENTER, DEFENDANT-EMPLOYER, LIBERTY MUTUAL INSURANCE COM-
PANY, Defendant-Carrier

No. COA02-1122

(Filed 2 September 2003)

**Workers' Compensation— post-traumatic stress disorder—
mental health nurse**

The Industrial Commission could properly find in a workers'
compensation case that a mental health nurse with post-
traumatic stress disorder suffered from a compensable occupa-
tional disease, even though evidence to the contrary existed.
Plaintiff presented evidence that supports the Commission's
determination that her mental disorders stem from a job with
unique stresses to which the general public is not exposed.

Appeal by defendants from opinion and award filed 30 April 2002
by the North Carolina Industrial Commission. Heard in the Court of
Appeals 22 May 2003.

*Gray, Newell, Johnson & Blackmon, L.L.P., by Angela Newell
Gray, for plaintiff appellee.*

*Davis and Hamrick, L.L.P., by Shannon Warf Beach, for
defendant appellant.*

McCULLOUGH, Judge.

Plaintiff, a registered nurse who formerly worked at defendant
Charter Pines Behavioral Center (hereinafter "Charter") filed a
Workers' Compensation action against defendant claiming that she
suffered from post-traumatic stress disorder (PTSD), an occupational
disease which arose from her employment. On 25 April 2001, the
Deputy Commissioner denied her claim on the basis that plaintiff
failed to prove that her condition resulted from an occupational dis-
ease characteristic of her employment excluding ordinary diseases of
life to which the general public is equally exposed. Plaintiff appealed
to the Full Commission, and on 30 April 2002, the Full Commission
filed an opinion and award reversing the decision of the Deputy
Commissioner and allowing benefits for an occupational disease with
Commissioner Mavretic dissenting. Defendants appeal on the basis
that the Commission erred in finding plaintiff's occupational disease
compensable under the Workers' Compensation Act.

The evidence before the Commission tended to show that this was plaintiff's first job upon graduating from nursing school. According to plaintiff, Charter apparently had administrative and staffing problems. This led to her doing more than what her job originally required. Further, the Mental Health Assistants (MHA's) of whom she was in charge failed to do their jobs, again according to plaintiff, causing her to have to do portions of their jobs as well. This was in addition to the stress that came from working with patients whose problems ranged from being suicidal, homicidal, or otherwise disturbed due to mental disease and/or substance abuse.

One of the MHA's, Jay Laws, gave plaintiff particular problems. On one occasion, plaintiff asked Laws to perform a particular function which Laws apparently believed was not in his job description. Laws became angry, yelling and throwing documents at plaintiff while patients were nearby watching. Further, Law and another MHA, Ann Cutts, were having an extramarital affair, and would indulge themselves while on duty, further neglecting their duties.

On 5 February 1998, plaintiff instructed Laws to perform a function. Again, Laws refused. Plaintiff pressed Laws by warning him that if he did not do as she instructed, she would report him and have him sent home. Laws did not back down, and informed plaintiff he would retaliate by telling the superiors that plaintiff had been sexually involved with other employees.

Plaintiff went to the hospital administration, but was not given any assistance. Laws continued to disobey plaintiff, so plaintiff filed a written complaint and Laws was sent home and lost one day's pay.

Laws came in the next day and made good on his promise, making an explicit and detailed written complaint accusing plaintiff of sexual harassment. Apparently, the investigation into these allegations, which substantiated some of the claim, was also done in such a way as to cause plaintiff further anguish and embarrassment.

"The culmination of these events at Charter resulted in plaintiff's experiencing debilitating migraine headaches[.]" Plaintiff stopped going to work on 10 February 1998 as the migraines became overwhelming. She saw a psychiatrist, Dr. Randy Readling, who noted that her visit was related to the event with Laws. He diagnosed her with PTSD, the onset of which was due to the events at Charter. The Full Commission noted Dr. Readling's testimony:

d) Plaintiff had a previous history of an abusive relationship; however she had functioned very well for years. Plaintiff had gone through nursing school; had supported herself and her children in the interim between her first divorce and second marriage and *was functioning very well at Charter until this incident occurred.*

(Emphasis added.) However, Dr. Readling also noted, as the Full Commission found:

e) Many incidents occurred at Charter that caused stress to plaintiff, including plaintiff's concern about the safety of the children, improper staffing, and being instructed to clock out while still being required to continue working. Plaintiff received no support from supervisors, which caused her a great deal of stress.

f) An incident involving the death of a child patient at Charter in March, 1998, impacted the plaintiff strongly because the plaintiff took it very personally. Plaintiff's best friend was a nurse who had been on the unit at the time of the child's death. Newspapers, numerous television stations/shows, including 60 minutes and the local news, ran stories about the death of the child at Charter, as well as the overall incompetence of Charter Staff members and inadequate care provided to Charter patients. Plaintiff felt that if she had voiced her concerns louder perhaps something would have changed to have prevented the death of the child.

Dr. Readling was of the opinion that plaintiff's job was a stressful position, and that she "was exposed to an increased risk of developing stress or some type of symptom like stress as a result of her job at Charter. . . . Someone working as a nurse in a psychiatric hospital is exposed to a much higher degree of stress than the general public."

Plaintiff also saw Dr. John Rodenbough, a neuropsychologist. Like Dr. Readling, Dr. Rodenbough diagnosed plaintiff with PTSD due to events at Charter. The Full Commission noted that plaintiff was fearful of an individual at her job, namely, Laws.

e) Plaintiff expressed a lack of support that occurred around her employment in relationship to what was happening with ["Jay"] and the things that were happening at work.

SMITH-PRICE v. CHARTER PINES BEHAVIORAL CTR.

[160 N.C. App. 161 (2003)]

f) Plaintiff complained about interactions with Jay Laws regarding aggressive conflicts, including throwing objects at her. A letter that was produced by Laws regarding graphic sexual activity he contends occurred between both himself and the plaintiff; or other male employees and the plaintiff, was given to Jean Hubbard. Hubbard shared the details of those accusations with non-essential personnel. The reaction to the letter by plaintiff's supervisors created a great deal of fear in plaintiff.

g) A critical element essential for the diagnosis of PTSD is the patient's perception of whether their life is in danger of or [sic] either bodily harm or death. One of the variables that played a significant role in the diagnosis of PTSD was the supervisor's response to the situation at work.

h) Plaintiff was transferred because of the sexual allegations of Laws, and the letter became semi-public knowledge with colleagues that plaintiff worked with. Physicians and other staff members were talking about the letter. This was very frightening to the plaintiff. She did not feel supported at work. Plaintiff felt she was being punished because of the letter. Plaintiff felt that the supervisors were treating her offensively, and it interfered with her chosen profession.

Another doctor, Dr. James Carter, testified that she was traumatized by this ordeal. A former supervisor at Charter, Irene Adamson, testified that the staff at Charter was improperly trained, disregarded state standards of patient care, and had numerous conflicts, all while attempting to care for the mentally ill patients. According to Adamson, plaintiff's nursing license could have been in jeopardy due to poor job performance by subordinates, as she would have been responsible. Adamson testified that she left Charter due to the "chaotic atmosphere."

The Full Commission found that:

15. Plaintiff's experiences at the job while employed by Charter Pines caused her occupational diseases. These job experiences placed plaintiff at an increased risk for contracting these occupational diseases. Members of the public generally were not exposed to these job experiences. Testimony to the effect that the *type* of job that plaintiff had did not cause her occupational dis-

eases is not a defense. *The particular experiences of her particular work* caused her occupational disease, not the mere fact that she was a registered nurse in a psychiatric hospital.

In its conclusions of law, the Full Commission noted that it relied on *Keller v. City of Wilmington Police Dept.*, 65 N.C. App. 675, 309 S.E.2d 543 (1983), *disc. review allowed*, 310 N.C. 625, 315 S.E.2d 690 (1984), adding its own emphasis in the following quote:

> "Peculiar to the occupation" means that the *conditions of the employment* (emphasis added) must result in a hazard which distinguished it in character from the general run of occupations and is in excess of attending employment in general.

*Id.* The Deputy Commissioner also cited this quote in its opinion and award denying plaintiff benefits, and noted that "no evidence to support plaintiff's theory that this was a common problem with registered nurses at Charter. There is not a recognizable [link] between the nature of the plaintiff's job as a registered nurse and an increased risk of contraction of PTSD or job related stress." The Full Commission disagreed and found that plaintiff indeed had contracted a compensable occupational disease.

## Standard of Review

The standard for appellate review of an opinion and award of the Industrial Commission is well settled. Review "is limited to a determination of (1) whether the findings of fact are supported by competent evidence, and (2) whether the conclusions of law are supported by the findings." *Barham v. Food World,* 300 N.C. 329, 331, 266 S.E.2d 676, 678, *reh'g denied,* 300 N.C. 562, 270 S.E.2d 105 (1980); *see also Calloway v. Memorial Mission Hosp.*, 137 N.C. App. 480, 484, 528 S.E.2d 397, 400 (2000); *Shah v. Howard Johnson,* 140 N.C. App. 58, 61, 535 S.E.2d 577, 580 (2000), *disc. review denied,* 353 N.C. 381, 547 S.E.2d 17 (2001).

In addition, "so long as there is some 'evidence of substance which directly or by reasonable inference tends to support the findings, this Court is bound by such evidence, even though there is evidence that would have supported a finding to the contrary.' " *Id.* at 61-62, 535 S.E.2d at 580 (quoting *Porterfield v. RPC Corp.*, 47 N.C. App. 140, 144, 266 S.E.2d 760, 762 (1980)). The *Calloway* Court went further stating that "our task on appeal is not to weigh the respective evidence but to assess the *competency* of the evidence in support of

the Full Commission's conclusions." *Calloway*, 137 N.C. App. at 486, 528 S.E.2d at 401.

---

In *Woody v. Thomasville Upholstery, Inc.*, 146 N.C. App. 187, 552 S.E.2d 202 (2001), *rev'd*, 355 N.C. 483, 562 S.E.2d 422 (2002), it was explained that

> "[f]or a disability to be compensable under our Workers' Compensation Act, it must be either the result of an accident arising out of and in the course of employment or an 'occupational disease.'" *Hansel v. Sherman Textiles*, 304 N.C. 44, 51, 283 S.E.2d 101, 105 (1981). By the express language of N.C. Gen. Stat. § 97-53 (1999), only the diseases and conditions enumerated therein shall be deemed to be occupational diseases within the meaning of the Act. Because neither fibromyalgia nor depression is specifically mentioned in N.C.G.S. § 97-53, the issue is whether these two diseases fall within subsection (13) of the statute, which defines an "occupational disease" as
>
> > [a]ny disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.
>
> N.C.G.S. § 97-53(13). Our Supreme Court has interpreted this language as requiring three elements in order to prove that a disease is an "occupational disease": (1) the disease must be characteristic of and peculiar to the claimant's particular trade, occupation or employment; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation (proof of a causal connection between the disease and the employment). *See Hansel*, 304 N.C. at 52, 283 S.E.2d at 105-06 (citing *Booker v. Medical Center*, 297 N.C. 458, 468, 475, 256 S.E.2d 189, 196, 200 (1979)). Further, in *Rutledge v. Tultex Corp.*, 308 N.C. 85, 301 S.E.2d 359 (1983), our Supreme Court explained what is required to establish the first two elements:
>
> > To satisfy the first and second elements it is not necessary that the disease originate exclusively from or be unique to the particular trade or occupation in question. All ordinary diseases of life are not excluded from

the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded. Thus, the first two elements are satisfied if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally. ["]The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workmen's compensation.["]

> *Id.* at 93-94, 301 S.E.2d at 365 (citations omitted).

*Id.* at 197-98, 552 S.E.2d at 209.

The resolution of this case requires this Court to reconcile the Commission's opinion and award with two principal cases in determining whether plaintiff has met her burden under our case law. Those cases are *Woody,* 146 N.C. App. 187, 552 S.E.2d 202, and *Pulley v. City of Durham,* 121 N.C. App. 688, 468 S.E.2d 506 (1996). In *Woody,* our Supreme Court reversed this Court which had upheld the Commission's finding of a compensable occupational disease for a sales manager at defendant's furniture company where the disease was brought on by conflict with an abusive supervisor. Our Supreme Court adopted Judge Martin's dissent where he stated:

> I must respectfully dissent from that portion of the majority opinion which holds that the evidence and the Commission's findings support its conclusions that plaintiff's employment exposed her to a greater risk of contracting depression and fibromyalgia than the public generally and that her depression and fibromyalgia are compensable occupational diseases.

> Although the majority correctly cites the definition of an occupational disease, as contained in G.S. § 97-53(13), and our Supreme Court's interpretation of the statute, as contained in *Booker v. Duke Medical Center,* 297 N.C. 458, 256 S.E.2d 189 (1979) and further explained in *Rutledge v. Tultex Corp.,* 308 N.C. 85, 301 S.E.2d 359 (1983), I do not believe the majority or the Commission has correctly applied the law to the facts as found by the Commission. Notwithstanding the fact that plaintiff's job-related stress caused her depression and aggravated her fibromyalgia, such facts cannot support the conclusion that plaintiff's mental and physical conditions were occupational diseases

as defined by the statute. The findings indicate merely that plaintiff suffered from depression and fibromyalgia after being placed in the unfortunate position of working for an abusive supervisor, which can occur with any employee in any industry or profession, or indeed, in similar abusive relationships outside the workplace. Therefore, I do not believe plaintiff's conditions can be construed as "characteristic of and peculiar to" her particular employment; they are ordinary diseases, to which the general public is equally exposed outside the workplace in everyday life. *See Rutledge*, 308 N.C. at 93, 301 S.E.2d at 365 ("Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded.") In my view, to hold these conditions to be occupational diseases compensable under G.S. § 97-53(13), under the facts of this case, stretches beyond the intent of the Workers' Compensation Act. Thus, I would reverse the award of compensation.

*Woody*, 146 N.C. App. at 201-02, 552 S.E.2d at 211.

In *Pitillo v. N.C. Dep't of Envtl. Health & Natural Res.*, 151 N.C. App. 641, 566 S.E.2d 807 (2002), this Court and the Commission followed *Woody* in denying benefits stating:

Under appropriate circumstances, work-related depression or other mental illness may be a compensable occupational disease. *Jordan v. Central Piedmont Community College*, 124 N.C. App. 112, 476 S.E.2d 410 (1996); *Baker v. City of Sanford*, 120 N.C. App. 783, 463 S.E.2d 559 (1995), *disc. review denied*, 342 N.C. 651, 467 S.E.2d 703 (1996). However, the claimant must prove that the mental illness or injury was due to stresses or conditions different from those borne by the general public. *Woody v. Thomasville Upholstery Inc.*, 355 N.C. 483, 562 S.E.2d 422 (2002) (adopting dissent in 146 N.C. App. 187, 202, 552 S.E.2d 202, 211 (2001)). Thus, the claimant must establish both that her psychological illness is " 'due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment' " and that it is not " 'an ordinary disease of life to which the general public is equally exposed.' " *Booker v. Medical Center*, 297 N.C. 458, 468, 256 S.E.2d 189, 196 (1979) (quoting N.C.G.S. § 97-53(13) (2001)); *see also Norris v. Drexel Heritage Furnishings*, 139 N.C. App. 620, 534 S.E.2d 259 (2000) (upholding denial of claim based on occupational disease: although plaintiff's fibromyalgia was caused or aggravated by employment with defendant, there was no evidence that her employment with

defendant placed plaintiff at an increased risk of contracting or developing fibromyalgia as compared to the general public not so employed).

*Id.* at 648, 566 S.E.2d at 813.

In *Pulley*, a police officer suffered from depression. The Full Commission found that

> [t]hroughout [plaintiff's] employment as a Police Officer and Public Safety Officer with defendant-employer, plaintiff was involved in dealing with situations in which people were the victims of or had committed criminal acts. Plaintiff was also involved in dealing with situations involving motor vehicles, including instances of personal injury or death. During her period as an officer with the Youth Division, she was involved in dealing with minors who were either committing criminal acts or against whom criminal acts had been committed.

121 N.C. App. at 694, 468 S.E.2d at 510.

A doctor testified that there was a "recognizable link between the nature of police work and increased risk of contracting depression." *Id.* This Court found competent evidence to support all this. Further,

> [t]he Full Commission found that "when asked the causes of the depression and post-traumatic stress syndrome, Dr. Hostetter testified at extreme length concerning a number of factors, all of which were related to plaintiff's job." The Full Commission also found that "Dr. Zeil [sic] felt plaintiff's employment as a public safety officer for the city of Durham significantly contributed to her development of depression. . . . Dr. Zeil [sic] felt plaintiff's work was causally connected to plaintiff's depression." There is sufficient competent evidence in the record to support these findings of fact by the Full Commission and to satisfy the third element for establishing the existence of an occupational disease. Accordingly, we conclude that the Full Commission did not err in awarding plaintiff workers' compensation benefits.

*Id.*

Many cases cite *Pulley* for the proposition that emotional injury is compensable. *See Caple v. Bullard Restaurants, Inc.*, 152 N.C. App. 421, 429, 567 S.E.2d 828, 834 (2002); *Beaver v. City of*

*Salisbury*, 130 N.C. App. 417, 420, 502 S.E.2d 885, 888 (1998); *Jordan v. Central Piedmont Community College*, 124 N.C. App. 112, 118, 476 S.E.2d 410, 413 (1996), *disc. review denied*, 345 N.C. 753, 485 S.E.2d 53 (1997).

In *Jordan*, it was stated that:

Recent cases from this Court have recognized depression, a mental condition, as an occupational disease and compensable under the Act. In *Baker v. City of Sanford*, 120 N.C. App. 783, 463 S.E.2d 559 (1995), *disc. review denied*, 342 N.C. 651, 467 S.E.2d 703 (1996), the Industrial Commission found that plaintiff suffered from work-related depression which it stated was an occupational disease. However, the Commission concluded the plaintiff's disability was not the result of this occupational disease, but was a consequence of an intervening event. This Court reversed and remanded the case stating, among other things, the Commission erred in denying benefits to plaintiff because it did not employ the proper, three-part analysis in concluding plaintiff's depression was not compensable. (For a disease to be occupational, it must be (1) characteristic of claimant's trade or occupation; (2) the disease must not be an ordinary disease of life to which the general public is equally as exposed; and (3) the disease must be causally connected to the claimant's employment. *Rutledge v. Tultex Corp.*, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983)).

The *Baker* Court pointed to an earlier case, *Harvey v. Raleigh Police Dept.*, 85 N.C. App. 540, 355 S.E.2d 147, *disc. review denied*, 320 N.C. 631, 360 S.E.2d 86 (1987), *appeal after remand*, 96 N.C. App. 28, 384 S.E.2d 549, *disc. review denied*, 325 N.C. 706, 388 S.E.2d 454 (1989), as recognizing depression as an occupational disease. *Baker*, 120 N.C. App. at 788, 463 S.E.2d at 563. In *Harvey*, a police officer committed suicide and his wife filed for workers' compensation benefits under N.C. Gen. Stat. § 97-38 alleging Harvey suffered from the occupational disease of depression due to his employment with the Raleigh Police Department. The Full Commission denied plaintiff's claim, but this Court reversed and remanded the case concluding the Industrial Commission made inadequate findings of fact to support its conclusions of law.

More recently, this Court upheld an award for compensation to a plaintiff who was suffering from depression and post-

traumatic stress syndrome caused by her work as a police and public safety officer. *Pulley v. City of Durham*, 121 N.C. App. 688, 694, 468 S.E.2d 506, 510 (1996). In upholding the award, this Court used the three-part test for determining if an occupational disease is compensable under N.C. Gen. Stat. § 97-53(13). The Court then reviewed the Full Commission's findings of fact and conclusions of law and determined plaintiff had presented sufficient evidence to satisfy the test for a compensable occupational disease.

> The approach in *Harvey, Baker,* and *Pulley* was to apply to each plaintiff the three-part test for occupational disease to determine whether compensation was proper. *See Harvey,* 85 N.C. App. at 543, 355 S.E.2d at 150; *Baker,* 120 N.C. App. at 787, 463 S.E.2d at 562-63; *Pulley,* 121 N.C. App. at 693, 468 S.E.2d at 510 (all three cases applying the test outlined in *Rutledge,* 308 N.C. at 93, 301 S.E.2d at 365). These cases do not make a distinction between mental and physical occupational diseases. The question for each Court was simply whether plaintiff's condition met the test for compensable occupational disease.

*Id.* at 117-18, 476 S.E.2d at 413.

In the present case we find that plaintiff presented evidence which supports the Commission's determination that her mental disorders stem from a job which has unique stresses to which the general public is not exposed. Plaintiff was caring for the mentally ill whose problems ranged from the suicidal to those who were severely anxious or depressed. There had already been one death at Charter which resulted in local and national news coverage of the conditions at Charter under which plaintiff labored. This case presents a situation far more severe than merely an employee's relationship with an abusive supervisor as was the case in *Woody.*

We believe plaintiff worked in an atmosphere permeated with stress and this case is much more analogous to *Pulley* due to the fact that she worked with an aberrant population where treatment errors could (and did at least once) result in death. These are not common workplace stresses.

Thus we hold that the Commission could properly find, on the record before it, that plaintiff suffered from a compensable occupational disease, even though evidence to the contrary existed.

Accordingly, the opinion and award of the Commission is affirmed.

Judges McGEE and CALABRIA concur.