***********
Based upon the opinion of the Court of Appeals remanding the matter to the Commission for the entry of additional findings of fact including a definitive determination as to whether plaintiff was placed at a greater risk for contracting the psychological condition than the general public equally exposed, the Full Commission amends the October 6, 2005 Opinion and Award at Finding of Fact 28 and Conclusions of Law 1 and 2, as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff employee and defendant employer on March 18, 1999, and at all times relevant herein.
3. That employer was an approved self-insured and Gallagher-Bassett Services, Inc. was the servicing agent at all times relevant herein.
4. All of plaintiff's medical records with respect to this claim are admitted into evidence.
5. All discovery requests and responses filed by the parties are admitted into evidence.
6. Plaintiff's compensation rate is $560.00, the maximum rate for 1999. *Page 3 
7. The issues to be determined from this hearing are as follows:
 a) Whether plaintiff sustained an injury by accident or developed an occupational disease while in the course and scope of his employment with defendant-employer?
 b) If so, what, if any, benefits is plaintiff entitled to receive under the North Carolina Workers' Compensation Act?
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff's date of birth is January 15, 1942, and he began working for Schlitz Can Company in Winston-Salem, North Carolina in 1995. He operated a can production machine for three years and was promoted to a line supervisor overseeing can production lines in 1979. Plaintiff held this position until 1990, when he was promoted to Assistant Production Manager.
2. In the early 1990s, American National Can (hereinafter "ANC") purchased the Winston-Salem plant from Schlitz Can Company. ANC began a downsizing program, and the plaintiff's position as Assistant Production Manager was eliminated. Plaintiff was offered, and accepted in 1993, his former line supervisor management position. Plaintiff worked as a line supervisor overseeing can production until he stopped working for ANC on March 18, 1999.
3. Since 1975, plaintiff worked a swing shift from 7:00 a.m. to 7:00 p.m. The swing shift required plaintiff to work one 12-hour shift for three days. After working three shifts for three consecutive days, he would be off four days. The following week, plaintiff would work four 12-hour shifts, then would be off three consecutive days. Plaintiff testified that he averaged *Page 4 
working 13 to 14 hours each shift. Plaintiff averaged working between 45 and 49 hours each week. Plaintiff also confirmed that he was not required to work 14 days each month due to the unique nature of the swing shift.
4. Plaintiff and other members of plant management were required to attend weekly production meetings. The typical meeting lasted one to two hours but could last longer. Plaintiff was required to attend the production management meeting even if he was scheduled to be off that day. Plaintiff was a salaried line supervisor manager and was not paid overtime to attend the meetings. The primary topics addressed at the production management meetings were production and labor problems. Plaintiff and other former line supervisors testified the general tone of the production meetings was negative as the primary issues being addressed were production and labor problems.
5. Plaintiff testified that before 1993 he enjoyed his job at the Winston-Salem can plant. However, after being downsized by ANC and accepting his former position as line supervisor in 1993, he testified his job duties significantly changed. He testified the 1993 layoffs/downsizing negatively impacted his ability to do his job. Plaintiff and other former line supervisors testified that more job duties were placed on the line supervisor due to other management positions being eliminated. Plaintiff testified that it was harder to do his job because there was more pressure to work with less people. Plaintiff testified that his ability to do his job continued to change as more job tasks were given to him due to cutbacks in the work force.
6. ANC downsized again in 1996 and eliminated another line supervisor position, shop supervisor and quality control positions. Plaintiff testified that it became increasingly harder to do his job because he no longer had the administrative support these positions *Page 5 
previously provided him. Plaintiff testified that he felt as if he had twice as much to do following the 1996 downsizing.
7. Plaintiff also testified that during this period it became difficult to discipline the employees he was supervising. This was due to issues related to the union contract. Plaintiff testified that the union issues caused him additional job stress as he was not receiving support from management.
8. In 1998, plaintiff testified that ANC hired management/time consultants to evaluate the plant operations in order to increase productivity. According to plaintiff, the consultants recommended ANC eliminate additional management and hourly employees. This placed additional job demands on the line supervisor's position and caused plaintiff additional stress as he felt he was not being given added support to properly do his job.
9. Four former ANC employees testified on behalf of plaintiff. Bob Martin, Tom Woods, Neal Dan and James Fant all held the line supervisor position at various times between 1993 and 1999. They confirmed the line supervisor management position became harder to perform due to ANC's downsizing of staff. All four former line supervisors confirmed plaintiff's testimony that the position became increasingly more stressful. Mr. Martin, Mr. Woods and Mr. Dan were offered severance packages and elected to take early retirement. These three former line supervisors testified that the increasing levels of stress due to an increase in job duties was the primary reason they elected to take early retirement. All three are currently working in positions for other companies they described as having significantly less workplace stress. Mr. Fant is currently on long term disability due to conditions caused by a stroke.
10. Plaintiff identified in discovery and testified at his hearing the following work conditions at ANC caused his work-related stress: (1) cutbacks in workforce requiring him to *Page 6 
take on a heavier workload; (2) new job duties requiring him to work 13 to 14 hours per day; (3) being required to attend meetings on scheduled days off; (4) supervisors' demands to handle a constantly increasing workload while at the same time providing no support. Plaintiff was unable to identify any additional situations at work that caused him stress other than the items identified above.
11. Plaintiff testified that his employment was the most stressful the 8 to 10 months before he left his employment in March 1999. He stated the management changes required him to work harder, be more productive with less help and incur changes in the manner in which he performed his job.
12. Plaintiff sought psychiatric care from Dr. McCauley in March 1999. Dr. McCauley noted in his initial interview on March 19, 1999, the following medical history provided to him by plaintiff: "I am stressed from my job, from the physical and mental demands from the new owners, which have been getting worse for the past eight to ten months. As a result, I hate my peers and I feel like bashing them with arguments and I cannot forget what's been happening for more than a year."
13. Dr. McCauley also documented the following in his March 19, 1999 medical record: "He [plaintiff] attributed his symptoms to the amount of demands at work with inadequate staff assistance. As a result, he stated he was having to rush and work 13 hours a day, 3 to 4 days a week and having to attend compulsory meetings without pay, due to his having been on a salary. He described his other supervisors as being distressed and his immediate supervisors giving him negative feedback with increasing expectations. He stated the stressors have been this way for the past 13 to 14 months." *Page 7 
14. Plaintiff also described the job stressors to Dr. Elliott. Dr. Elliott was the IME physician selected by the Industrial Commission nurse after the parties were unable to agree upon a psychiatrist. Dr. Elliott's IME report states the following history given to him by plaintiff: "He [plaintiff] presents reporting that he left work at the American Can Plant on March 18, 1999. He reports he began having difficulties between eighteen months to two years prior to that date. In the 1 ½ to 2 years prior to his leaving in March 1999, he reports that things became significantly more stressful on his job. He states that time check consultants came in and began cutting back on workers, demanding higher productivity."
15. Three physicians and one psychologist testified in this matter: Dr. Artigues is a forensic psychiatrist selected by defendants to perform an IME. Dr. Artigues is board-certified in general and forensic psychiatry and is in private practice in Cary, North Carolina, and teaches at the Duke University Medical School. Dr. Artigues' IME evaluation included meeting with plaintiff for over two hours, listening to a complete set of the workers' compensation hearing tapes, reviewing plaintiff's medical records, Dr. Elliott's IME report and interviewing plaintiff's wife.
16. Dr. Artigues could not render an opinion that plaintiff was suffering from depression. Dr. Artigues reviewed the list of plaintiff's depressive symptoms identified by Dr. McCauley in 1999. Dr. Artigues testified that plaintiff did not give a history of having a current depressed mood, crying, decreased appetite, sleep disorders, inability to experience pleasure or suicidal or homicidal thoughts. Dr. Artigues testified that plaintiff's current condition is that he is angry at his former employer. Dr. Artigues confirmed that plaintiff has no psychiatric symptoms until he is faced with dealing with his former situation at work. At that time, he *Page 8 
becomes extremely angry. Dr. Artigues confirmed that anger is not a psychiatric diagnosis and is not identified in medical authorities as a psychiatric condition.
17. Dr. Artigues has treated approximately 100 patients in her private practice for job-related stress issues over the past three years. She confirmed that approximately half of these patients complained of job stress of a similar nature to those identified by plaintiff. Dr. Artigues said that plaintiff's situation in which he did not feel supported by supervisors, which he was asked to do more work in less time, and which he did not feel supported by his under-staff, and having to attend difficult and frustrating meetings, could happen in any workplace.
18. Dr. Artigues also stated that the list of job stressors and duties identified by plaintiff at the hearing and in discovery were not characteristic of and peculiar to his employment with ANC. Her expert opinions are based on her experience as a clinical psychiatrist who has and is currently treating patients with job-related stress issues. Dr. Artigues also stated that plaintiff was not at a greater risk of developing psychiatric issues when compared to the general public. Dr. Artigues testified that any worker has an increased risk who is working in a situation in which productivity demands are increasing and the number of people available to do that work is decreasing. The situation is not unique to ANC and can happen in any employment job or occupation.
19. Dr. Artigues also confirmed the three MSNBC business articles and the NISOH literature on stress provided to her by defendants and attached to her deposition confirmed her general ideas about the U.S. work force that she already had. She said the articles published by MSNBC and NISOH confirmed her belief that productivity demands for workers were increasing in spite of the fact that many corporations have layoffs, and that this results in people being expected to work harder and that job stress is on the rise as a result. *Page 9 
20. Plaintiff retained Jerry Noble, PhD, to perform an IME. Dr. Noble diagnosed plaintiff as being depressed and said that plaintiff's working conditions at ANC was a causal factor in plaintiff developing depression.
21. Dr. Noble also testified plaintiff's job at ANC exposed him to a greater risk of suffering from depression than members of the public generally. The basis of his opinion was the business management theory developed by Dr. Karasak in the 1970s. Based on the control-demand model, Dr. Noble felt that plaintiff's job at ANC placed high work demands upon him yet gave him a very low level of discretion in how he performed his job. Dr. Noble testified that any employee in any industry or profession that has demands at work coupled with low levels of discretion is at a greater risk of developing depression than the general public.
22. Dr. Noble also testified that he has treated employees who have had jobs that have high demands but low levels of discretion from every major industry group, including professionals, service and manufacturing industry employees. These jobs included insurance administrators, hospital administrators, informational systems employees, teachers and electricians. Dr. Noble confirmed that all these employees had the common denominator of having a high demand job with low level of discretion and were, therefore, at a greater risk of developing depression.
23. Dr. Noble did not identify specific factors unique to plaintiff's job that led to the development of plaintiff's psychological issues.
24. Dr. Elliott diagnosed plaintiff with depression and confirmed that plaintiff's working conditions at ANC were a significant contributing factor to plaintiff having developed depression. *Page 10 
25. Dr. Elliott testified that plaintiff was at a greater risk of developing depression due to the working conditions described to him by counsel for plaintiff. Dr. Elliott confirmed that the basis of his opinion was Dr. Karasak management theory which stated that any individual with a high demand/low level of job control was at a greater risk for stress in his or her job.
26. Dr. Elliott testified that all of the job stressors identified by plaintiff were not unusual or unique to his position at ANC. Dr. Elliott confirmed that the job stressors identified by plaintiff could exist in any job or profession. Dr. Elliott did not identify specific factors unique to plaintiff's job that led to the development of plaintiff's psychological issues.
27. Dr. McCauley, plaintiff's treating psychiatrist, testified and continued to maintain a diagnosis of depression. Dr. McCauley testified that the working conditions at ANC caused plaintiff's depression. Dr. McCauley said plaintiff was at a greater risk of developing depression due to the job stressors identified by plaintiff. However, Dr. McCauley did not identify specific factors unique to plaintiff's job that led to the development of plaintiff's psychological issues.
28. Based upon the totality of the evidence and testimony elicited from the doctors, the Full Commission gives greater weight to the opinion of Dr. Artigues and finds that plaintiff's job did not place plaintiff at an increased risk for contracting his psychological condition than the general public. There is no competent evidence in the record to establish that plaintiff's working conditions at ANC exposed him to unique or peculiar job stressors to which the general public is not exposed. The greater weight of the evidence is that the job stressors plaintiff experienced at ANC can occur in any profession or industry. The working conditions which brought on plaintiff's increased level of stress are not characteristic of and peculiar to his line management supervisor position with ANC because these working conditions can occur in any industry, trade or profession. *Page 11 
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983).
2. Work-related depression or other mental illness may be a compensable occupational disease. Smith-Price v. Charter PinesBehavioral Center, 160 N.C. App. 161 (2003). A claimant must prove that "the mental illness was due to stresses or conditions different from those borne by the general public." Pitillo v. N.C. Dep't of Envtl.Health Natural Res., 151 N.C. App. 641, 648, 566 S.E.2d 807, 813
(2002). In the case at hand, plaintiff's psychological issues are not due to causes and conditions characteristic of and peculiar to plaintiff's employment with defendant as a line supervisor; rather his psychological condition is an ordinary disease of life to which the general public, not so employed, is equally exposed. Plaintiff, therefore, has failed to prove that he sustained an occupational disease as a result of his employment with defendant-employer. N.C. Gen. Stat. § 97-53(13); see Lewis v. Duke University, 163 N.C. App. 408,594 S.E.2d 100 (2004).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD 1. Under the law, plaintiff's claim must be and is hereby denied. *Page 12 
2. Each side shall pay their own costs.
This the 25th day of April, 2008.
S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DANNY LEE MCDONALD COMMISSIONER *Page 1