* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. An employment relationship existed between plaintiff and defendant-employer.
2. At all relevant times, defendant-employer was a duly-qualified self-insured.
3. Plaintiff's average weekly wage is $1,212.37, which yields a maximum compensation rate for 2004 of $688.00 per week.
4. Plaintiff has not received any workers' compensation benefits from defendant for the alleged injuries she sustained on June 30, 2004.
5. The following were stipulated into evidence at the Deputy Commissioner's hearing:
 a. Stipulated Exhibit #1, Pre-Trial Agreement, as modified and initialed by the parties.
 b. Stipulated Exhibit #2, medical records.
 c. Stipulated Exhibit #3, I.C. forms and discovery.
6. Plaintiff contends that the issues are whether she is entitled to compensation for the post-traumatic stress disorder she allegedly sustained at work, from December 7, 2004 to the present, and whether she is due any compensation for medical expenses or for permanent partial disability.
7. Defendant contends that the issues are whether plaintiff's claim for benefits is barred by N.C. Gen. Stat. §§ 97-22, 97-24, 97-58, or any other section of the North Carolina Workers' Compensation Act; if not, whether plaintiff suffered a compensable injury by accident or occupational disease under the Act resulting in psychological injuries; and, if so, whether defendant is entitled to full credit for short and long term disability benefits paid by defendant-employer to plaintiff pursuant to N.C. Gen. Stat. § 97-42. *Page 3 
 * * * * * * * * * * * RULINGS ON EVIDENTIARY MATTERS
At the Deputy Commissioner's hearing in this matter on March 1, 2007, defendant moved to withdraw its Stipulations on the Pre-Trial Agreement submitted to the Deputy Commissioner that granted the Industrial Commission jurisdiction over this matter. Defendant argued that Stipulation #1 and #2 of the Pre-Trial Agreement mistakenly gave the Industrial Commission jurisdiction over the matter by agreement or consent of the parties. Defendant and plaintiff presented arguments on the motion and defendant's motion was denied by the Deputy Commissioner. However, upon reconsideration, the Deputy Commissioner granted defendant's motion to withdraw Stipulations #1 and #2 of the March 1, 2007 Pre-Trial Agreement. The Full Commission hereby affirms the Deputy Commissioner's granting of defendant's motion to withdraw the Stipulations.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the hearing before the Deputy Commissioner, plaintiff was 43 years old and was hired by defendant-employer on or about August 15, 1988 as a systems analyst in their Raleigh office. Plaintiff has a B.S. degree in computer science and extensive industry training in networking/printing and graphic arts.
2. Plaintiff's job duties as a systems analyst involved accompanying sales representatives on pre-sale consultations with customers to determine whether any of defendant-employer's *Page 4 
systems or product lines could address customers' needs. Her post-sale job responsibilities required her to address any outstanding issues with system implementation.
3. Plaintiff worked primarily with software and hardware on the computer front end for printers and also supported data centers, office environments, and in-house print shops/commercial printers for commercial products. Plaintiff worked out of defendant-employer's Six Forks Road office 50-60% of the time prior to the office "going virtual" in July 2004, after which she worked from home. After July 2004, plaintiff spent additional time on-site at customer locations and also attended seminars and road shows. Plaintiff was on the telephone a significant amount of time with customers and co-workers as part of her job.
4. Plaintiff testified at the Deputy Commissioner's hearing that she began having problems with a co-worker, Douglas Armour, in the fall of 2003. She stated that in fall 2003, she witnessed Mr. Armour become upset at a seminar they were attending and throw a computer cable at the ground. She alleged that Mr. Armour slammed a door and stated that a man who unplugged his computer was "too stupid to live."
5. Plaintiff was part of a sub-group comprised of other analysts in her office and when she was in the office, she worked out of a cubicle that was part of a larger group of approximately 25 cubicles. Mr. Armour's cubicle was located next to plaintiff's. Plaintiff testified that he would sometimes slam the phone down, and that her adjoining cubicle wall would sometimes shake. Plaintiff admitted that she did not believe the cubicle shaking was directed at her. She also stated she had seen Mr. Armour shaking the vending machine at work. On May 7, 2004, plaintiff had an argument with Mr. Armour over the telephone. They argued over whose responsibility it was to support a certain account. Plaintiff testified that Mr. Armour:
 [S]tarted ranting and raving, and telling me — cursed — I mean, just cursed at — and I — and I was standing in my kitchen at the time, *Page 5 
and I had the phone way away from my ear. . . . And I was just bewildered, and so I — the last thing I said to Doug was, `Doug, I need to talk to you when you've calmed down.' He was, I mean, just cursing, and saying all kinds of horrible things, and so I — I did hang up the phone.
6. Shortly after the phone conversation with Mr. Armour, plaintiff went to her mother's house and began having tunnel vision, sweating and a rapid heart rate. Emergency services were called and she was diagnosed with a panic attack, given Xanax, and released that same day.
7. At the Deputy Commissioner's hearing, plaintiff testified that during the May 7, 2004 call, Mr. Armour never threatened her in any way, but simply became angry when she denied that the account was her responsibility.
8. On May 10, 2004, plaintiff sought treatment at Harps Mill Internal Medicine with Dr. Grace Rose, who noted that plaintiff had an "upsetting event" with a co-worker. Plaintiff was diagnosed with anxiety/stress, prescribed Xanax, and written out of work for one week.
9. On May 13, 2004, plaintiff saw psychotherapist Pam Koretsky for her anxiety. Ms. Koretsky noted that plaintiff was still out of work after her panic attack. On May 17, 2004, she noted that plaintiff was still out of work, but was planning on returning the following day.
10. From May 7, 2004 until May 17, 2004, plaintiff was disabled due to her anxiety disorder and post-traumatic stress disorder.
11. After seeing plaintiff several times, Ms. Koretsky noted plaintiff's symptoms continued for more than thirty days and that she felt plaintiff was experiencing post-traumatic stress disorder (PTSD). Ms. Koretsky discussed the diagnosis with plaintiff in May or June 2004 and that she believed plaintiff's symptoms were related to her argument with her co-worker at work on May 7, 2004. Plaintiff continued to treat with Ms. Koretsky until October 2004. *Page 6 
12. Plaintiff returned to Harps Mill Internal Medicine and was seen by her regular doctor, Dr. James O'Rourke, on May 19, 2004. She noted complaints of difficulty sleeping. Dr. O'Rourke's diagnosis was acute anxiety/panic disorder. At his deposition, Dr. O'Rourke testified that he discussed the work-related nature and cause of plaintiff's diagnosis with her on May 19, 2004. Thus, the Commission finds that on May 19, 2004, plaintiff was made aware of the work-related nature and cause of her anxiety/post-traumatic stress disorder and, as such, that is the date of disability for this claim.
13. Plaintiff returned to work and spoke to her supervisor, Debbie Martin, regarding concerns about working with Mr. Armour. Ms. Martin informed plaintiff that since defendant-employer's office was "going virtual" and analysts would be working primarily out of their homes, plaintiff's future contact with Mr. Armour would be limited.
14. Between May 7, 2004 and July 2004, plaintiff only saw Mr. Armour one to three times and did not have any further confrontations or arguments with him.
15. Plaintiff alleged that in July 2004, she saw Mr. Armour yelling at a co-worker who had not prepared appropriately for the switch to virtual. She testified that after the office became virtual, she also had to be part of weekly conference calls with five to six co-workers, which also involved Mr. Armour. She did not recall any inappropriate behavior by Mr. Armour on any of these calls.
16. In September 2004, defendant-employer tried to conduct a conflict resolution meeting between Mr. Armour and plaintiff due to plaintiff's ongoing problems with Mr. Armour; however, plaintiff refused to participate in the meeting.
17. Plaintiff attended a team dinner for 15 to 20 people in November 2004 and Mr. Armour was present. Plaintiff did not have any interaction with Mr. Armour at the meeting and *Page 7 
nothing out of the ordinary occurred. However, plaintiff alleged that she was scared and frightened of Mr. Armour, so she left the dinner early.
18. On November 29, 2004, plaintiff returned to see Dr. O'Rourke, who noted plaintiff had continued stress at work. Dr. O'Rourke's diagnosis was anxiety/post-traumatic stress disorder and he recommended a referral to a psychiatrist that specialized in post-traumatic stress disorder and continued use of medication. At his deposition, Dr. O'Rourke testified that he could not offer an opinion regarding whether plaintiff's being in a work environment where a violent episode occurred placed her at a greater risk for developing PTSD than the general public.
19. Plaintiff's first period of disability due to the PTSD was from May 7, 2004 until May 17, 2004. On December 6, 2004, plaintiff went out of work on defendant-employer's short-term disability plan due to her post-traumatic stress disorder. She has not returned to work since December 6, 2004. Plaintiff did not file or report any type of workers' compensation claim until she filed a Form 33 with the Industrial Commission on June 29, 2006, which was not within two years of May 19, 2004, the date on which plaintiff was first informed by competent medical authority of the work-related nature of the PTSD. She did not report any type of work injury or work related disease to defendant-employer prior to that time and has not filed a Form 18.
20. On December 8, 2004, plaintiff saw psychologist Dr. David Russell for evaluation and treatment of acute anxiety and post-traumatic stress disorder. Dr. Russell indicated that plaintiff reported severe anxiety, hyper-arousal, irritability and difficulty sleeping beginning on May 7, 2004 when she was verbally harassed by a male co-worker. Dr. Russell agreed with Ms. Koretsky's diagnosis of post-traumatic stress disorder, felt plaintiff was also depressed, and recommended plaintiff receive trauma-focused psychotherapy. *Page 8 
21. In his deposition, Dr. Russell testified that when plaintiff was in college, her best friend committed suicide. He believed this incident made plaintiff vulnerable to developing PTSD and placed her at an increased risk. He also testified that the traumatic death of a loved one was the most common cause of PTSD in the United States. Dr. Russell testified that plaintiff could work in a job that did not involve stress and was not connected at all with "triggers." Dr. O'Rourke testified that the November 2004 incident put plaintiff at a higher risk for developing PTSD than the general public and that it aggravated her PTSD, assuming her PTSD was already established. Dr. O'Rourke stated that plaintiff has been totally disabled from work since December 2004.
22. The Commission gives greater weight to the testimony of Ms. Koretsky and Dr. O'Rourke than to Dr. Russell, as he was not familiar with the details of plaintiff's employment with defendant-employer.
23. Plaintiff returned to Dr. O'Rourke on January 4, 2005, who noted that plaintiff had become very emotional and had difficulty with her sister returning from a visit to her home state of Connecticut.
24. On January 31, 2005, plaintiff was seen by psychiatrist Dr. Randolph Grigg for an independent medical evaluation. Dr. Grigg agreed with the diagnosis of post-traumatic stress disorder and indicated that plaintiff was unable to work due to her symptoms.
25. On April 4, 2005, plaintiff began treatment with psychiatrist Dr. Michael Zarzar. On April 25, 2005, Dr. Zarzar noted a diagnosis of major depression and post-traumatic stress disorder and recommended continued use of anti-depressants and individual therapy.
26. On June 7, 2005, plaintiff was seen by psychiatrist Dr. James Bellard for a second opinion IME requested by defendant-employer's long term disability administrator. Dr. Bellard *Page 9 
agreed with the diagnosis of post-traumatic stress disorder as a result of the incident plaintiff experienced at work on May 7, 2004. He noted, "it remains difficult to understand why her symptoms are so dramatic and so resistant to treatment given that the trauma was relatively mild." He further noted that in cases where PTSD symptoms are this severe, one can usually identify a prior separate severe trauma.
27. From July and August 2005, Dr. Zarzar noted improvement in plaintiff's condition and in September 2005, he noted her condition was stabilizing.
28. On November 6, 2005, plaintiff reported to Dr. Zarzar that she was distressed over a recent coal mining accident. In February 2006, he noted a situation at a post office in another part of the country that triggered hyper-vigilance and fear in plaintiff. On May 11, 2006, Dr. Zarzar noted that plaintiff's hyper-vigilance was often triggered by "situations where trust is an issue."
29. On June 27, 2006, plaintiff reported improvement in her condition to Dr. Zarzar due to her anti-depressants and therapy with Dr. Russell.
30. At the March 1, 2007 hearing before the Deputy Commissioner, plaintiff testified that she was taking the anti-depressant Zoloft and Xanax for anxiety and that she continued to treat with Dr. Russell and Dr. Zarzar. She was not aware of any other co-workers at defendant-employer who had ever developed post-traumatic stress disorder.
31. Since going out of work on December 7, 2004, plaintiff received 100% of her salary for three to four months from defendant-employer's short term disability plan, and then began receiving 60% of her salary from their long-term disability plan. Since going out of work, plaintiff has not looked for employment with any other employer. She volunteers with the Junior League and conducts monthly programs for them. *Page 10 
32. Douglas Armour also testified in this matter. He stated that he worked with plaintiff for six and a half years at defendant-employer as a fellow systems analyst, but that he also worked with her previously as a client of defendant-employer at Atlantic Documentation Centers for approximately four to five years. His recollection of the phone conversation with plaintiff on May 7, 2004 was that they had an argument over whose responsibility a technical problem was for a client account. Mr. Armour stated that plaintiff previously told him she would take care of it, but during the call, she stated that she made no such commitment. He testified that they argued about whose responsibility the account was and then he called her a liar and hung up the phone. He stated that at no time did he ever verbally or physically threaten plaintiff, nor did he have the intention to scare or frighten her. Mr. Armour further stated that the conversation was entirely limited to a discussion of job responsibilities. He additionally testified that it was not uncommon to have disagreements about roles and responsibilities with co-workers. After defendant-employer's office went virtual several weeks after the phone conversation, his contact with plaintiff was limited to one to four conference calls, from 15 minutes to two hours in length.
33. Mr. Armour has never been involved in any type of physical altercation with a co-worker or a customer at defendant-employer or with any other employer. He stated that he never threatened a co-worker at work in any capacity, other than informing subordinates they may be terminated if job performance did not improve. He did not recall ever kicking the cubicle wall he shared with plaintiff, slamming the phone, or kicking the vending machine. Mr. Armor stated that he did not have any intention of physically intimidating plaintiff and that no other co-workers ever indicated they were intimidated by him. *Page 11 
34. During the six and a half years he worked with defendant-employer, Mr. Armour was unaware of any other systems analyst who developed post-traumatic stress disorder, anxiety attacks, panic disorder, or depression as a result of the job, and that there was nothing in particular about the job of a systems analyst that he thought would cause someone to develop psychological problems.
35. Mr. Armour acknowledged that human resources personnel did discuss the May 7, 2004 phone conversation with him as a result of plaintiff's filing a complaint, and a letter was placed in his personnel file regarding avoiding confrontations with co-workers. Mr. Armour's supervisor, Debbie Martin, and her supervisor, Doug Bland, met with him regarding the letter and warned him about hanging up the phone on people and yelling. Mr. Armour was warned that such further confrontations could result in his termination. Prior to that incident, Mr. Armour never received any type of verbal counseling or reprimand from defendant-employer. Mr. Armour did not recall ever having any type of corrective action regarding his behavior at his previous employer, Atlantic Document Company, where he worked five years or at another employer, Plain Paper Solutions.
36. Mr. Armour had no recollection of the event that plaintiff claimed occurred in fall 2003 when he allegedly got mad at someone for unplugging his computer. He did recall the incident in July 2004 when he got frustrated at a co-worker, Dorothy Wallace, for not being prepared for the office move. He stated that he did not have any type of confrontation or interaction with plaintiff on that date, but did become upset at Ms. Wallace for not being prepared. He indicated that he resolved the issue with Ms. Wallace that day and that they continue to work together and have not had any ongoing problems. *Page 12 
37. Plaintiff's co-worker Anthony Mancini also testified in this matter. Mr. Mancini has worked as a sales representative for defendant-employer for 20 years and worked with plaintiff from the mid-nineties until she left defendant-employer, and also with Mr. Armour during that same time period. Mr. Mancini did not have any recollection of Mr. Armour ever becoming irate at a seminar in the fall 2003 and telling anyone they were "too stupid to live."
38. In 2003 and 2004, Mr. Mancini was in the office approximately 30 percent of the time and had a cubicle approximately 50 to 75 feet from plaintiff. He did not recall ever seeing Mr. Armour kick or shake plaintiff's cubicle wall, kick or shake a vending machine, or ever physically or verbally threaten anyone. He also testified that he did not think Mr. Armour was scary, that he had never had another employee tell him they were scared of Mr. Armour, and that he thought it was a ridiculous idea. Mr. Mancini thought Mr. Armour was a competent systems analyst, enjoyed working with him, and felt he was passionate about his job. He indicated that Mr. Armour sometimes got loud or excited with people, but that it did not happen often.
39. Mr. Mancini also was not aware of any other systems analyst ever developing post-traumatic stress disorder, anxiety attacks, panic attacks, panic disorder, or depression as a result of their job duties or any interaction with Mr. Armour. He also did not think there was anything in particular about the job of a systems analyst that would cause someone to develop psychological problems. He stated that it was not uncommon for employees to have disagreements about job responsibilities and that plaintiff had problems with customers with "timelines, turn around, time to resolve."
40. Plaintiff's co-worker Laura Townsend was also deposed in this matter. Ms. Townsend worked in a sales position for approximately 20 years in defendant-employer's Raleigh office and worked directly with plaintiff for approximately five years. She also worked *Page 13 
with Mr. Armour and knew him from his previous position with his old company. Ms. Townsend had a cubicle in the office in close proximity to plaintiff. She did not recall any type of event in the fall 2003 in which Mr. Armour became irate at a seminar at someone for unplugging his computer. She also did not recall ever seeing Mr. Armour ever kick or shake the cubicle wall, kick or shake the vending machine, physically or verbally threaten anyone, or get violent or intimidate any other employee. When asked whether she was ever scared of Mr. Armour, she responded "not in the least." She indicated she had only ever heard Mr. Armour raise his voice a few times.
41. Ms. Townsend also testified that although plaintiff was a talented analyst, "customers would call me and tell me that she didn't follow through on commitments and that was frustrating." Ms. Townsend was unaware in her 20 years at defendant-employer of any other systems analyst developing post-traumatic stress disorder, anxiety attacks, panic attacks, panic disorder, or depression as result of their job duties. Ms. Townsend did not think there was anything in particular about the systems analyst's job that would cause someone to develop psychological problems.
42. The testimony of Mr. Armour, Mr. Mancini, and Ms. Townsend is specifically found as credible and their testimony given greater weight than the testimony of plaintiff. Plaintiff's allegation that Mr. Armour "had a history of violent behavior" is not supported by any other competent evidence of record and was refuted by Mr. Armour and other witnesses.
43. Plaintiff's testimony is specifically given little weight based on the lack of support for her alleged version of events occurring in the workplace. *Page 14 
44. The Commission finds that plaintiff has not shown by the greater weight of the evidence that her employment with defendant-employer placed her at a greater risk of contracting anxiety disorder/post traumatic stress disorder than that of the general public.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-24 states, "(a) The right to compensation under this Article shall be forever barred unless (i) a claim or memorandum of agreement as provided in N.C. Gen. Stat. § 97-82 is filed with the Commission or the employee is paid compensation as provided under this Article within two years after the accident. . . ." The requirement that a claim be filed within a certain time is a condition precedent to the right to compensation and not a statute of limitation. Winslow v.Carolina Conference Ass'n, 211 N.C. 571, 191 S.E. 403 (1937). See alsoWhitted v. Palmer-Bee Co., 228 N.C. 447, 46 S.E.2d 109 (1948). For this reason, where a claim for compensation under the provisions of the Workers' Compensation Act has not been filed with the Industrial Commission within the two year period after the date of the accident that resulted in the injury for which compensation is claimed, or where the Industrial Commission has not acquired jurisdiction of such claim within the statutory period, the right to compensation is barred. Id. In this case, since plaintiff failed to file a claim within two years of May 19, 2004, the Industrial Commission does not have jurisdiction to hear plaintiff's claim as an alleged injury by accident under N.C. Gen. Stat. § 97-24. *Page 15 
2. The Industrial Commission also does not have jurisdiction to hear plaintiff's claim as an alleged occupational disease under N.C. Gen. Stat. § 97-58. N.C. Gen. Stat. § 97-58 states, in part:
 b) The report and notice to the employer as required by G.S. 97-22 shall apply in all cases of occupational disease except in case of asbestosis, silicosis, or lead poisoning. The time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has same.
 (c) The right to compensation for occupational disease shall be barred unless a claim be filed with the Industrial Commission within two years after death, disability, or disablement as the case may be."
In Taylor v. J.P. Stevens Co., 300 N.C. 94, 265 S.E.2d 144 (1980), the North Carolina Supreme Court interpreted this statute to mean that the two year period in which a claim for benefits for an occupational disease must be filed begins when an employee has suffered from an injury from an occupational disease that renders the employee incapable of earning, at any job, the wages the employee was receiving at the time of the incapacity and the employee is informed by competent medical authority of the nature and work-related cause of the disease. In this case, plaintiff's first period of disability due to the PTSD was from May 7, 2004 until May 17, 2004. Plaintiff was informed by Dr. O'Rourke on May 19, 2004 of the work related nature and cause of her anxiety disorder, depression, and post-traumatic stress disorder. However, plaintiff did not file any claim until June 29, 2006, more than two years after she was made aware of her injury from an occupational disease, and therefore, her claim must be dismissed with prejudice for lack of jurisdiction. N.C. Gen. Stat. § 97-58.
3. Assuming arguendo that the Industrial Commission had jurisdiction over plaintiff's claim, plaintiff failed to present sufficient evidence that she suffered a compensable injury by accident on May 7, 2004. Plaintiff's alleged May 7, 2004 argument with her co-worker *Page 16 
does not qualify as an "unlooked for and untoward event not expected or designed by the employee." Searsey v. Perry M. Alexander ConstructionCo., 35 N.C. App. 78, 239 S.E.2d 847 (1978).
4. Assuming arguendo that the Industrial Commission had jurisdiction over plaintiff's claim, plaintiff also failed to present sufficient evidence that she suffered a compensable occupational disease. The claimant bears the burden of proving the existence of an occupational disease. Norris v. Drexel Heritage Furnishings, Inc., 139 N.C. App. 620,621, 534 S.E.2d 259, 261 (2000). While mental illness qualifies as a compensable occupational disease under appropriate circumstances, seeSmith-Price v. Charter Pines Behavioral Ctr., 160 N.C. App. 161, 171,584 S.E.2d 881, 887-88 (2003), the claimant must first establish that "the mental illness or injury was due to stresses or conditions different from those borne by the general public." Pitillo v. N.C. Dep't of Envtl.Health Natural Res., 151 N.C. App. 641, 648, 566 S.E.2d 807, 813
(2002). In this case, plaintiff failed to meet her burden of producing competent or credible evidence that her employment with defendant-employer placed her at an increased risk more so than the general public for developing post-traumatic stress disorder or other conditions. Woody v. Thomasville Upholstery Inc., 355 N.C. 483,562 S.E.2d 422 (2002).
5. Assuming arguendo that plaintiff's claim was compensable and is disabling, defendant-employer is entitled to a full credit for short and long-term disability benefits paid to plaintiff during her times out of work, pursuant to N.C. Gen. Stat. § 97-42.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER *Page 17 
1. Plaintiff's claim is hereby dismissed with prejudice for lack of jurisdiction.
2. Each side shall bear its own costs.
This 29th day of September, 2008.
 S/___________________ LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1